ALBANY OYER AND TERMINER.    January, 1859.    Before *Harris*, Justice of the Supreme Court, and the Justices of the Sessions.

## THE PEOPLE *v.* MARY HARTUNG.

Form of an indictment for murder by poisoning, against M. H., as principal, and W. R., as accessory before the fact, with counts at common law and under the statute.

Circumstantial evidences of guilt on trial of an indictment for murder by poisoning

Appearances of stomach and intestines, on *post mortem* examination, in case of poisoning, described, with opinions of scientific men on the subject.

Charge of the presiding judge on a trial at the Oyer and Terminer, in a case of alleged murder by poisoning.

It is a reprehensible irregularity for a jury, after they have retired to deliberate on a trial for murder, to take the opinions of the constable in attendance, on the question whether the jury could bring in a verdict of manslaughter, and to send for the Revised Statutes and examine their provisions in relation to the crimes of murder and manslaughter.

Such an irregularity is sufficient to vitiate a verdict of "guilty," unless it appears beyond all reasonable doubt that no injury has resulted from it to the prisoner.

The evidence of jurors is not to be allowed for the purpose of impeaching or in any way impairing the effect of their verdict.

*It seems*, there is no rule which prevents the constable, sworn to attend the jury, from being present in the jury room during the deliberations and discussions of the jury, though the practice is disapproved.

THE following indictment had been found against Mary Hartung as principal, and William Reimann as accessory before the fact:

*City and County of Albany, ss:*

    The jurors for the People of the State of New York, in and for the body of the city and county of Albany, being then and there sworn and charged upon their oath, present:

The People *v.* Hartung.

That Mary Hartung, late of the city of Albany, in the county of Albany aforesaid, not having the fear of God before her eyes, but being moved and seduced by the instigation of the devil, wickedly contriving and intending one Emil Hartung, the husband of the said Mary Hartung, with poison, willfully, feloniously, and of her malice aforethought, to kill and murder, on the tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, with force and arms, at the city of Albany, in the county of Albany aforesaid, feloniously, willfully, and of her malice aforethought, did convey and have into the dwelling house of said Emil Hartung, there situate, a great quantity of white arsenic, to wit, ten drachms of white arsenic, being a deadly poison, and that the said Mary Hartung, afterwards, to wit, on the same day and year and place aforesaid, the said white arsenic in the said house then and there being, then and there feloniously, willfully, and of her malice aforethought, with the intent aforesaid, did put into, mix and mingle with certain water, gruel, beer and soup, and certain other substances to the jurors aforesaid unknown, the said Mary Hartung then and there knowing the said white arsenic to be deadly poison, and that the said Mary Hartung afterwards, to wit, on the same day and year aforesaid, at the city of Albany, in the county of Albany aforesaid, willfully, feloniously, and of her malice aforethought, did take, give, administer and deliver to the said Emil Hartung, the said white arsenic, so put into, mixed and mingled in manner and form aforesaid, with the intent that he, the said Emil Hartung, should take, drink and swallow down the same into his body, the said Mary Hartung then and there well knowing the said white arsenic to be a deadly poison, and the said white arsenic so taken, given, administered and delivered to the said Emil Hartung, by the said Mary Hartung, in manner and form as aforesaid, the said Emil Hartung did take, drink and swallow down into his body, he, the said Emil Hartung, not knowing that there was any white arsenic, or other poisonous ingredient put into, mixed and mingled with the said water, gruel, beer and soup aforesaid, and substances as afore-

said, by means whereof the said Emil Hartung became and was mortally sick and distempered in his body; and the said Emil Hartung, of the poison aforesaid, so by him taken, drank and swallowed down into his body as aforesaid, and of the mortal sickness and distemper occasioned thereby, from the said tenth day of April, in the year aforesaid, until the twenty-first day of April, in the year aforesaid, at the city of Albany and county of Albany aforesaid, did languish, and languishing did live, on which said twenty-first day of April in the year aforesaid, at the city of Albany, in the county of Albany aforesaid, the said Emil Hartung, of the poison aforesaid, so given, administered and delivered, taken, drank and swallowed down as aforesaid, and of the said mortal sickness and distemper occasioned thereby, died. And so the jurors aforesaid do say, that the said Mary Hartung, in manner and form aforesaid, him, the said Emil Hartung, feloniously, willfully, and of her malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That William Reimann, late of the city of Albany, in the county of Albany aforesaid, laborer, before the said felony and murder was committed, in manner and form aforesaid, by the said Mary Hartung, to wit: On the tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, at the city of Albany, in the county of Albany aforesaid, was accessory thereto before the fact; and then and there feloniously and willfully, and of his malice aforethought, did counsel, hire, advise, command and procure the said Mary Hartung, the felony and murder aforesaid, in manner and form aforesaid, to do and commit, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That the said Mary Hartung, willfully contriving and intending said Emil Hartung, with poison, willfully, feloniously, and from a premeditated design to effect the death of

said Emil Hartung, to kill and murder, on the said tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, with force and arms, at the city of Albany, in the county of Albany aforesaid, feloniously, willfully, and from a premeditated design to effect the death of him, the said Emil Hartung, did convey and have into the house of said Emil Hartung, there situate, a great quantity of white arsenic, to wit, ten drachms of white arsenic, being a deadly poison, and that the said Mary Hartung afterwards, to wit, on the same day and year, and place aforesaid, the said white arsenic in the said house then and there being, then and there feloniously, willfully, and from a premeditated design to effect the death of him, the said Emil Hartung, and with the intent aforesaid, did put into, mix and mingle with certain water, gruel, beer and soup, and certain other substances to the jurors aforesaid unknown, the said Mary Hartung then and there well knowing the said white arsenic to be a deadly poison, and that the said Mary Hartung afterwards, to wit, on the same day and year aforesaid, at the city of Albany, in the county of Albany aforesaid, willfully, feloniously, and from a premeditated design to effect the death of the said Emil Hartung, did take, give, administer and deliver to the said Emil Hartung the said white arsenic so put into, mixed and mingled, in manner and form aforesaid, with the intent that he, the said Emil Hartung, should take, drink and swallow down the same into his body ; the said Mary Hartung then and there well knowing the said white arsenic to be a deadly poison, and the said white arsenic so taken, given, administered and delivered to the said Emil Hartung by the said Mary Hartung, in manner and form as aforesaid, the said Emil Hartung did take, drink and swallow down into his body, he, the said Emil Hartung, not knowing that there was any white arsenic or other poisonous ingredients put into, mixed and mingled with the said water, gruel, beer and soup and substances as aforesaid, by means whereof the said Emil Hartung became and was mortally sick and distempered in his body ; and the said Emil. Hartung, of the poison aforesaid so by him taken, drank and swallowed down

into his body as aforesaid, and of the mortal sickness and dis-temper occasioned thereby, from the said tenth day of April, in the year aforesaid, until the twenty-first day of April in the year aforesaid, at the city of Albany, in the county of Albany aforesaid, did languish, and languishing did live, on which said twenty-first day of April, in the year aforesaid, at the city of Albany, in the county of Albany aforesaid, the said Emil Har-tung of the poison aforesaid so given, administered and deliv-ered, taken, drank and swallowed down as aforesaid, and of the said mortal sickness and distemper occasioned thereby, died. And so the jurors aforesaid, upon their oath aforesaid, do say, the said Mary Hartung, in manner and form aforesaid, him, the said Emil Hartung, feloniously, willfully, and from a premedi-tated design to effect the death of him, the said Emil Hartung, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do fur-ther present: That the said William Reimann, before the said felony and murder was committed in manner and form afore-said, by the said Mary Hartung, to wit: on the tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, at the city of Albany, in the county of Albany aforesaid, was accessory thereto before the fact, and then and there feloniously, willfully, and from a premeditated design to effect the death of the said Emil Hartung, did counsel, advise, command and procure the said Mary Hartung, the felony and murder aforesaid, in manner and form aforesaid, to do and com-mit, against the form of the statute in such case made and pro-vided, and against the peace of the People of the State of New York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do fur-ther present: That the said Mary Hartung, willfully contriving and intending said Emil Hartung with poison, willfully, felo-niously, and of her malice aforethought, to kill and murder, on the said tenth day of April, in the year of our Lord one thou-sand eight hundred and fifty-eight, with force and arms, at the

The People *v.* Hartung.

city of Albany, in the county of Albany aforesaid, feloniously, willfully, and of her malice aforethought, did convey and have into the dwelling-house of said Emil Hartung there situate, a great quantity of the sulphuret of arsenic, to wit, ten drachms of the sulphuret of arsenic, being a deadly poison, and that the said Mary Hartung afterwards, to wit, on the same day and year and place aforesaid, the said sulphuret of arsenic in the said house then and there being, then and there feloniously, willfully, and of her malice aforethought, with the intent aforesaid, did put into, mix and mingle with certain water, gruel, beer and soup, and certain other substances to the jurors aforesaid unknown, the said Mary Hartung, then and there well knowing the said sulphuret of arsenic to be a deadly poison, and that the said Mary Hartung afterwards, to wit, on the same day and year aforesaid, at the city of Albany, in the county of Albany aforesaid, willfully, feloniously, and of her malice aforethought, did take, give, administer and deliver to the said Emil Hartung, the said sulphuret of arsenic, so put into, mixed and mingled, in manner and form aforesaid, with intent that he, the said Emil Hartung, should take, drink and swallow down the same into his body, the said Mary Hartung then and there well knowing the said sulphuret of arsenic to be a deadly poison, and the said sulphuret of arsenic so taken, given, administered and delivered to the said Emil Hartung by the said Mary Hartung in manner and form aforesaid, the said Emil Hartung did take, drink and swallow down into his body, he, the said Emil Hartung, not knowing that there was any sulphuret of arsenic or other poisonous ingredient put into, mixed and mingled with the said water, gruel, beer and soup aforesaid, and substances as aforesaid, by means whereof the said Emil Hartung became and was mortally sick and distempered in his body, and the said Emil Hartung, of the poison aforesaid, so by him taken, drank and swallowed down into his body as aforesaid, and of the mortal sickness and distemper occasioned thereby, from the said tenth day of April, in the year aforesaid, until the twenty-first day of April, in the year aforesaid, at the city of Albany, in the county of Albany afore-

said, did languish, and languishing did live, on which said twenty-first day of April, in the year aforesaid, at the city of Albany, in the county of Albany aforesaid, the said Emil Hartung, of the poison aforesaid so given, administered and delivered, taken, drank and swallowed down as aforesaid, and of the said mortal sickness and distemper occasioned thereby, died. And the jurors aforesaid, upon their oath aforesaid, do say, that the said Mary Hartung, in manner and form aforesaid, him, the said Emil Hartung, feloniously, willfully, and of her malice aforethought, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That the said William Reimann, late of the city of Albany and county of Albany aforesaid, before the said felony and murder was committed, in manner and form aforesaid, by the said Mary Hartung, to wit, on the tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, at the city of Albany, in the county of Albany aforesaid, was accessory thereto before the fact, and then and there feloniously and willfully, and of his malice aforethought, did counsel, hire, advise, command and procure the said Mary Hartung, the felony and murder aforesaid, in manner and form aforesaid, to do and commit, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That the said Mary Hartung, willfully contriving and intending said Emil Hartung with poison, willfully, feloniously, and from a premeditated design to effect the death of said Emil Hartung, to kill and murder, on the said tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, with force and arms, at the city of Albany, in the county of Albany aforesaid, feloniously, willfully, and from a premeditated design to effect the death of him, the said Emil Hartung, did convey and have into the house of said Emil

Hartung, there situate, a great quantity of the sulphuret of arsenic, to wit, ten drachms of the sulphuret of arsenic, being a deadly poison, and that the said Mary Hartung afterwards, to wit, on the same day and year and place aforesaid, the said sulphuret of arsenic in the said house then and there being, then and there feloniously, willfully, and from a premeditated design to effect the death of him, the said Emil Hartung, and with the intent aforesaid, did put into, mix and mingle with certain water, gruel, beer and soup, and certain other substances to the jurors aforesaid unknown, the said Mary Hartung, then and there well knowing the said sulphuret of arsenic to be a deadly poison, and that the said Mary Hartung, afterwards, to wit, on the same day and year aforesaid, at the city of Albany, in the county of Albany aforesaid, willfully, feloniously, and from a premeditated design to effect the death of him, the said Emil Hartung, did take, give, administer and deliver to the said Emil Hartung, the said sulphuret of arsenic, so put into, mixed and mingled, in manner and form aforesaid, with the intent that he, the said Emil Hartung, should take and swallow down the same into his body; the said Mary Hartung then and there well knowing the said sulphuret of arsenic to be a deadly poison, and the said sulphuret of arsenic so taken, given, administered and delivered to the said Emil Hartung, in manner and form as aforesaid, the said Emil Hartung did take, drink and swallow down into his body, he, the said Emil Hartung, not knowing that there was any sulphuret of arsenic, or other poisonous ingredients, put into, mixed and mingled with the said water, gruel, beer and soup, and substances as aforesaid, by means whereof said Emil Hartung became and was mortally sick and distempered in his body, and the said Emil Hartung, of the poison aforesaid, so by him taken, drank and swallowed down into his body as aforesaid, and of the mortal sickness and distemper occasioned thereby, from the said tenth day of April, in the year aforesaid, until the twenty-first day of April, in the year aforesaid, at the city of Albany, in the county of Albany aforesaid, did languish, and languishing did live, on which said twenty-first day of April, in the year afore-

said, at the city of Albany, in the county of Albany afore-
said, the said Emil Hartung, of the poison aforesaid, so given,
administered and delivered, taken, drank and swallowed down
as aforesaid, and of the said mortal sickness and distemper
occasioned thereby, died. And so the jurors aforesaid, upon
their oath aforesaid, do say, that the said Mary Hartung, in
manner and form aforesaid, him, the said Emil Hartung,
feloniously, willfully, and from a premeditated design to effect
the death of him, the said Emil Hartung, did kill and murder,
against the form of the statute in such case made and provided,
and against the peace of the People of the State of New York,
and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do fur-
ther present: That the said William Reimann, before the said
felony and murder was committed, in manner and form afore-
said, by the said Mary Hartung, to wit, on the tenth day of
April, in the year of our Lord one thousand eight hundred and
fifty-eight, at the city of Albany, in the county of Albany
aforesaid, was accessory thereto before the fact, and then and
there feloniously, willfully, and from a premeditated design to
effect the death of him, the said Emil Hartung, did counsel,
advise, command and procure the said Mary Hartung, the
felony and murder aforesaid, in manner and form aforesaid, to
do and commit against the form of the statute in such case
made and provided, and against the peace of the People of the
State of New York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do fur-
ther present: That the said Mary Hartung, feloniously, will-
fully, and of her malice aforethought, and from a premeditated
design to effect the death of the said Emil Hartung, devising
and intending the said Emil Hartung, to poison, kill and mur-
der, on the tenth day of April, in the year of our Lord one
thousand eight hundred and fifty-eight, with force and arms, at
the city of Albany, in the county of Albany aforesaid, a cer-
tain quantity of deadly poison, to wit, ten drachms of deadly
poison, a more particular description of which is to the jurors
aforesaid unknown, feloniously, willfully, of her malice afore-

The People *v.* Hartung.

thought, and from a premeditated design to effect the death of the said Emil Hartung, did give and administer unto the said Emil Hartung, with intent that he should take, drink and swallow down the same into his body, the said Mary Hartung then and there well knowing the same to be a deadly poison, and the said deadly poison so given and administered unto the said Emil Hartung as aforesaid, the said Emil Hartung did then and there take and swallow down into his body, by means and by reason of which said taking, drinking and swallowing down the said deadly poison into his body as aforesaid, the said Emil Hartung, became and was mortally sick and distempered in his body, of which said mortal sickness and distemper the said Emil Hartung, from the said tenth day of April, in the year last aforesaid, until the twenty-first day of April of the same month, in the same year, at the city and county of Albany aforesaid, did languish, and languishing did live, on which said twenty-first day of April, in the year aforesaid, at the city of Albany and county of Albany, aforesaid, the said Emil Hartung, of the poison aforesaid, so given, administered, taken and swallowed down as aforesaid, and of the said mortal sickness and distemper occasioned thereby, died. And so the jurors aforesaid, upon their oath aforesaid, do say, that the said Mary Hartung, him, the said Emil Hartung, in manner and form aforesaid, feloniously, willfully, and of her malice aforethought, and from a premediated design to effect the death of him, the said Emil Hartung, did kill and murder, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That the said William Reimann, before the said felony and murder was committed, in manner and form aforesaid, by the said Mary Hartung, to wit, on the tenth day of April, in the year of our Lord one thousand eight hundred and fifty-eight, at the city of Albany, in the county of Albany aforesaid, was accessory thereto before the fact, and then and there feloniously, willfully, and of his malice aforethought, and

from a premeditated design to effect the death of the said Emil Hartung, did counsel, advise, command and procure the said Mary Hartung, the felony and murder aforesaid, in manner and form aforesaid, to do and commit, against the form of the sta- tute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

SAMUEL G. COURTNEY, *District Attorney.*

The prisoner pleaded not guilty, and the case was brought on to trial at the Albany Oyer and Terminer, in January, 1859, before Mr. Justice *Harris*, and the Justices of the Sessions.

*Samuel G. Courtney* (District Attorney), and *Lyman Tremain*, Attorney-General, for the People.

*W. J. Hadley* and *A. J. Colvin*, for the prisoner.

The following testimony was taken:

*Dr. Joseph Levi*, sworn as a witness for the prosecution, tes- tified: I am a physician and surgeon, practising in Albany; I know defendant, and have known her for six or seven years; I knew Emil Hartung; I knew him sometime longer; my ac- quaintance with defendant commenced when she was married to Emil Hartung; I have attended the family sometimes; in April last I was called upon to attend Emil Hartung; first saw him in my office; it was on the 11th of April; he complained of a pain in his throat; he coughed most all the time he was in my office; he looked rather feverish; after a short examination of the pulse and throat, and after giving a description of the whole case, how he felt for the last few weeks, I formed the opinion that he was suffering from acute inflammation of the larynx; he told me that several weeks previous he exposed himself very imprudently in the lager beer cellar of Mr. Schin- dler; that he had taken off his coat, vest and neckhandker- chief, and exposed himself to a draft; that as soon as he came out he felt that he had taken cold; that he felt himself hoarse, and had slight pain in the throat; this affection, he said,

The People *v.* Hartung.

troubled him some all the time, but did not prevent him from going about his business; but for the last two days his case had become worse, and that the night before he came, he could not sleep all night; I prescribed for him; I wrote a prescription for him, and told him to go to Saulters and get it there; the prescription was six grains of tartar emetic, dissolved in six ounces of water, with directions to take a common spoonful every two hours; I directed him to put a mustard plaster on his neck, to drink tea made of marsh mallow root, and to go to bed, and try to get into a perspiration; he then left me; I was called to see him at his house next day; his house was on the south side of Division street, between Green and Union; he kept a lager beer saloon, and found him in the back room of the first story in bed; his breathing was a little easier than the day previous; he told me he had been in a perspiration all night; that he had vomited frequently during the night, and the morning, too; I ordered a blister to be put on his throat; he complained still about the pain in his throat, and about the cough; ordered the rest of the medicine to be continued, in smaller doses, on account of the vomiting; I went again the same evening; that was on the 12th of April; it was between 9 and 10 o'clock; there was little, but there was the inclination to vomit yet; I called again next morning; I generally saw his wife there; his condition was rather worse; there was a great deal of oppression of the chest, difficulty of breathing; I found it advisable to bleed him; I bled him; I discontinued the tartar emetic on account of his inclination to vomit; I prescribed nitrate of potassium, and muriate of ammonia, to be dissolved in a mixture made of a mucilage of gum arabic and sweet almonds; I am not positive that the bleeding took place on the 13th or the 14th; I think it was on the 13th; I called again the same evening; found him a good deal better; I followed the same treatment for the next three or four days; I called on the 14th; he did not complain of the pain, but the hoarseness and cough continued; the fever was less; if I bled him on the 14th, the improvement I have mentioned was on the 15th; from that evening there was a little improvement

every day; the hoarseness and the cough continued, the cough with less violence; he sometimes expectorated blood; I thought the case was assuming a chronic character; did not change the treatment for the next two days; saw him twice every day; on the 19th and 20th, I made a different prescription, consisting of muriate of ammonia, and a few grains of henbane; during the whole sickness he complained of an aversion to food; his wife complained that he would not take any of the drinks prescribed; he continued to ask for cold water or lager beer; when I told him he must take such nourishment as I prescribed, he said he couldn't—that everything had such a peculiar taste; his wife was present; on the 20th of April I visited him in the morning; found him the same as the day previous; rather better; he said he had no passage for the last 48 hours; I left him two light cathartic pills, with directions to take them; I went again at 10 o'clock that evening; found him so changed that I considered him in a dying condition; his face was hypocratic, showing distress, as if seeking for air; could get no breath; his breathing was very laborious; he was very restless, throwing himself from one side of the bed to the other; the pulse very quick, small, irregular; extremities cold; his skin of a livid color; I was surprised, exclaimed, For God's sake what has taken place, he has changed so quick; his wife said, "Since you gave him the pill this morning he hasn't stopped purging and vomiting;" I said "that is an impossibility, the pill can be borne by a child two years of age;" I asked for some other cause of the symptoms; "what has been done—what did he eat or drink that he has come to such a condition?" she said he had been drinking excessively all day cold water and lager beer; I asked her for the vomit and the stools; she said it had been thrown away; I left him a very little pill, containing about half a grain of opium, considering it a case of cholera morbus, contracted in his debilitated state, by exposure and intemperance, drinking the cold water and beer; his wife told me he went down into the cellar to get water himself; I left him, telling him I would be back again in about an hour; I came back a little before 12 o'clock; found

him still worse, and rapidly sinking; I gave up all hopes of his recovery, and left the house; when I went out I did not know that his wife was aware of his condition; I found there a man boarding in the house—a man by the name of Reimann; his wife was in the room when I went there; I have some recollection that I saw Mr. Malder there; about 3 o'clock Malder came for me; I declined going; about half an hour after, he came again, and requested me to go once more; I went; staid but a very little while; he was dying; he couldn't speak; I think he had no consciousness; his skin was more livid; I mean the extremities; his feet and hands were of a livid color; he asked permission to drink water most all the time I was there; he asked permission to eat beer soup; he said nothing would taste well but beer soup; I asked defendant, when there, what she had given him; it was in consequence of what I saw in the condition of the patient; it was his aversion to all food; she said everything she offered him was declined after he had tasted it; I asked him why he did not take different food and drinks offered him; he said he would not have anything but what tasted fresh to him, water or lager beer; she said he ate a little of the beer soup; the larger portion he would not take; when I was there the night before he died, he said, " O, what a pain;" I asked him where the pain was; he did not answer, but said, " I would rather be dead than alive;" these were the last words I heard of him; the vomiting for the first two days, and the purging, I considered the effect of the tartar emetic; I considered all the symptoms, during his sickness, natural, except the symptoms of the last evening; I prescribed nothing except what I have stated; the medicine I prescribed would not resemble, in taste or smell, phosphorus; I was careful in investigating the cause of the aversion to food; his wife told me that before he got sick, he didn't eat much, and that he drank a great deal of beer; I considered his intemperance as the cause of the aversion to food; this, and the tartar emetic, and fever, and coughing, would account for the distaste for food; the symptoms of poisoning by arsenic, as laid down by different writers, are purging, vom-

iting, cutting, perforating pain in the region of the stomach, general distress, burning thirst, appearance of bluish, sometimes dark red, spots on the skin of the body, in some instances falling off of the hair, a very frequent, irregular, intermittent pulse, evacuation of the bowels, and the vomit, intermixed with blood, and sometimes foamy matter; convulsions generally take place; Hartung, I should think, was 30 and some years old; Emil Hartung died on the 21st of April last.

Being *cross-examined*, he testified: I am 38 years old; am a German; have been here ten years last June; have been practising my profession in this city during all that time; was a physician and surgeon before I came here; got my diploma at home; I have prescribed for Hartung before; once for bleeding at the nose; he had the appearance of being a heavy drinker of lager beer; he was a man of a full plethoric habit; a heavy cold would take severe hold of such a man; he was laboring under a severe cold on the 11th of April; his whole system was in a state of fever from the effects of that cold; he coughed severely and almost incessantly; he had been laboring under the effects of the cold about three weeks when he called to see me; complained that he had suffered very much from it for the last two days; before that, he said he was hoarse from coughing; he did not complain of any pain or physical disability before he took the cold; I did not put up any of the medicines I prescribed; the prescriptions were in the Latin language, all of them; I directed him to take them all to Saulter's; the fever would naturally render him adverse to food; a patient suffering from fever has generally no appetite, but a constant desire to drink, especially cold water; the effect of the tartar emetic would be to produce thirst; tartar emetic is a mineral poison; it was after the fever abated, and the case assumed a more chronic character, that he expectorated blood; I did not make the cathartic pills I left him, myself; I got them from a Mr. Griffin: I can't say how long I had had them before I gave them to Hartung; I did not see them prepared, and don't know of my own knowledge what they contained; when I came out of the room the last night I was there, Rei-

mann was standing behind the door; I asked him whether he knew that Hartung was in a dying condition; he said, "yes, I know;" then I asked him "if Mrs. Hartung is prepared for the event;" and added that it would be advisable to prepare her for the event; he said "she is prepared—he had told her to-day it is no use to harm herself too much, she might get sick herself, and her children would suffer under it;" he said something to the effect that "he had been preparing her for that event;" I think Reimann was not fully dressed at the time; I had before seen Reimann; he was playing at a German theatre.

*Theodore Malder*, sworn as a witness for the prosecution, testified: I reside in New York; in April and May, 1858, I resided in the house of deceased at 46 Division street; I had resided there previous to their moving into the house; I knew defendant; they came there about February, 1858; they kept a lager beer saloon and boarding-house; I had known deceased before that about a year or two; I recollect about the time he was taken sick; it was in April, about the 10th or 11th; he had been around the house a few days before taking to his bed; he complained of cold; he took to his bed for the first on Saturday night; I saw him frequently while he was confined to his bed; saw defendant in his room; I once heard a quarrel between defendant and deceased; it was before he was taken sick, a week or two; he told her he would not take her to balls any more; he said he wanted to dance with her, and she was engaged, and would not dance with him; she begged him to let her go again; I occupied the front room; there was a folding-door between my room and his; I was in his room on Sunday after he was taken sick; he was alone; he was hoarse; complained about his throat; I visited him often; generally when I came to my meals; I saw him two or three days before he died; I found him one night about one or two o'clock in his room; he was out of bed; was very much excited; he called me in from my room; he knocked on my door; I went in; his wife was there; his children were there; he asked me if I would not get him a drink of water; he did not want his

wife to bring him the water; he said she didn't care a damn for him; defendant was on another bed in the room; his bed was near the folding-door; her bed on the other side of the room; the first thing he said when I went in, was about getting water; he was out of bed and angry; I got him in bed, and then went for water; this was before defendant said anything; after I brought him the water he drank it; she said to him he did not treat her right; that she would get the water, but he would not let her; I left the room; the day before, she told me she did not sleep there; that day she said her husband was very low; said he didn't do what the doctor ordered him to do; said he went down in the basement and got water for himself; I asked her why she let him go; she said she didn't sleep in his room; I said she ought to sleep there to attend to him nights; she said there was no other bed there; I went into Hartung's room, and told him if he wanted anything nights, if he would knock on the door I would get it for him; that night he called; I saw him again the next day when I went to dinner; he was alone; he was always in a kind of excitement; I saw him again the night he died; he died about half-past seven or eight o'clock in the morning of the 21st of April last; defendant called me in about two o'clock; she was there, and Reimann; deceased was out of bed on the chamber; his wife and Reimann held him; he could hardly breathe; he begged me to run for the doctor, or he would be choked; I run after the doctor; I came back; the doctor didn't come; found deceased in his bed; I left the room and went to bed myself; a short while after defendant called me again; wanted me to go for the doctor again; I went into deceased's room; he begged me to go quick; was afraid he would choke to death; I went after Dr. Levi again; he came; Hartung was then sinking very fast; he begged the doctor to save him, he was so choked; begged the doctor not to leave him; he complained of burning in his chest; said " Oh, cut that open;" wanted to get out of bed; after the doctor left, I remained in the room with Reimann; I heard a conversation between the defendant and Reimann, about seven o'clock; Reimann said to defendant,

The People *v.* Hartung.

" we should have a post-mortem examination to see what ailed him ;" she said, " Oh no, oh no, I won't have him cut open ;" I then left; there were other persons there at the time; I said " it wouldn't be necessary, because I thought he died of inflammation of the throat ;" he died Wednesday morning; I think he was buried next day ; at the funeral the corpse was in the bar-room ; there were ladies there ; defendant was in my room up stairs; there were other ladies there; before deceased was taken sick, about five weeks before, deceased was drinking coffee; he said, " what is in my coffee, it looks so curious I won't drink it ;" defendant got up from the table, and took his cup of coffee and carried it down stairs; she brought up another cup ; she said that in the cup she carried down there had been sulphuric acid; that Mr. Wintzen had given it to her to clean tin with; that the coffee might unfortunately have been put in the cup without its being cleaned out; she said it was poisoning; I said to deceased in a joke, " Your wife wants to poison you ;" she got mad at me ; she did not say anything; a few days after, I told her I did not mean anything; defendant had two children; one about fourteen months old, one other about three years old.

Being *cross-examined*, he testified : I am thirty years of age; am a German ; have been in this country about six and a half years; I came from Saxony; I was a copyist there; I have been in Albany about two or three years; I boarded in the house when Decker kept it; myself and Reimann were both boarders when Hartung and his wife came there; I had known Reimann about a year previous; Reimann was a segar maker, and occasionally played in the theatre; I don't know whether Mrs. Hartung was acquainted with Reimann before they moved to Division street; I have stated all the quarrel I ever heard between Hartung and his wife; Hartung had contracted this cold about two weeks before he was confined to bed; Hartung went to work as usual, and took his meals with the boarders, down to the time he was confined to his bed; up to the time Hartung was taken sick, Reimann and myself and Streit, and two other three men boarded there, down to the time he was

confined to his bed; there was a basement; we took our meals before his sickness, in the bar-room; the hall is on the east side; the cooking was done in the basement; Mary Foell and Mrs. Hartung, I believe, did the cooking before this; I have seen Mrs. Hartung doing the cooking; the circumstance about the coffee cup took place when the family took their meals up stairs, and was about five weeks before he was confined; he was well as usual at that time; he was very hoarse during the two weeks before consulting Dr. Levi; I am not sure whether he took to his bed Saturday or Sunday; I can't remember what day he died, whether it was Wednesday or Thursday or Friday; it was during the week of his death that Hartung called me into his room; there were two beds in room the night Hartung knocked for me; at the time Mrs. Hartung said she would not have her husband cut open, Reimann said, in German, " We must have a post-mortem examination," and she said, " I won't have him cut open."

*Re-direct.*—I was one of the coroner's jurors; saw the body of deceased about four weeks after his death, at the burial ground; coroner Dean and Dr. Rheinhart were there; the body was that of deceased.

*Henry Schroeder* sworn as interpreter.

*Mary Foell,* sworn as a witness for the prosecution, examined through the interpreter, testified: I resided with defendant in February, March and April, 1858, in Division street; I did not know them before I went there; they kept a lager beer saloon; they kept boarders; I recollect of Hartung becoming sick; before he took to his bed he was a little sick; he had a hoarse throat; it was eight days, a fortnight, or three weeks after he complained of this before he took to his bed; I cannot say; he worked for Mr. Schindler at that time; he went to work every day until he was compelled to lay down; defendant attended him during his sickness; she furnished him with his meals, beer and beer soup during his sickness; she cooked them; they were cooked in the kitchen; it was under the bar-room; previous to his sickness, defendant had a conversation with me about going to a druggist's; this was before

The People *v.* Hartung.

he had a hoarse throat; he was quite well then; she said I should go to Mr. Saulter's for some blauseure (prussic acid); Saulter is an apothecary, at the corner of Green and Division streets, two or three doors from Hartung's; she said she would clean a copper vessel with it; I went to the druggist's; I asked for some blauseure; Saulter was not in; a young man was there; he said, "What do you want?" I said, "blauseure; he said, "that stuff we do not have, and if we had it we would not give it, for if you should smell of it it would kill you before you got home, for the smell itself would cause death;" then I was ashamed and went out; I returned to defendant and told her Saulter was not in, and the young man does not give it to me, that he said the smell alone would cause death; then she said "well," and I went off, and placed the bottle on the mantle-piece; she said nothing else; after that I had another conversation with defendant; it was the Sunday before Hartung died; it was in the basement, in the morning; no one present; I was in the kitchen when she came in; she asked me whether I was going out this afternoon; I said yes, if I can I will go out; she said I should bring something home with me for Mr. Streit; the name of it was arsenic; she said I had to be careful that I should not get any of it on my fingers or my dress; further, that the child did not get any of it; I took the child along with me; she said, it is poison; then I was right angry; she told me where to get it; in Pearl street, at Mr. Springhart's; I said, if it is poison, Mr. Springhart will not give it to me; Mr. Saulter neither has given it to me; then she said I should only say it was for Mr. Streit, a boarder; that he intended to stuff birds with it; that then Springhart would give it to me, she said; then in the afternoon, when I went out, I asked defendant whether I should bring it home with me; Reimann was there when I asked this; he was standing behind the bar; defendant then said to me in a low voice, "*I will go after it myself;*" this was all she said then; defendant said she was at Saulter's, and that he did not have that stuff.

The counsel for the People then proposed to put to the witness this question: Was anything said by Mrs. Hartung on the subject of not getting the arsenic at Mr. Saulter's, and if so, state it? The question was objected to, first, as leading, and second, as improper. The objection was overruled by the court, and the question admitted, and the prisoner, by her counsel, duly excepted. The witness answered as follows: " Yes, she said she was at Mr. Saulter's, and he did not have that stuff."

Defendant waited upon deceased; she cooked his meals; I saw her; she went out every time and had something between her fingers, which she *threw in;* I was in the kitchen at the time; she went into an entry where she got what she put in the food; there were shelves there; she went to a spot where a bottle was standing, and took something from the bottle—rather a jar—with her fingers; I did not notice this jar before the last three days before he died; then I found the jar and smelt of it; it smelt like phosphorus; it was a little yellow pot like that shown me; when she put her fingers in the jar, she · went in the kitchen *and put it in everything, in the tea, in the coffee, in the beer soup, and everything which was cooked;* I smelt of a piece of sandwich which he had left untouched, and found the same smell; this was at the same time she was putting it in the meals; this was a fortnight or three weeks before he went to bed; when she came out of the entry, after going to the jar, she would hold her hand partly behind her (witness describes how, with her own hand); I always noticed this smell in the articles of food she cooked; it made me cough (witness describes how); we had towels to wipe the kitchen vessels; after defendant had *thrown it* into the meals, then she washed off her fingers on the towel; I was often going to use the towel after that, but couldn't use it on account of the smell; I threw it among dirty wash; I washed the plates upon which the meals were put, and off which he had eaten; I had to wash them in five or six waters before the smell went off; I have never heard defendant say anything about rats or mice in the house; she said there were no rats in the house; I was

there at the time of Hartung's death; I think he died on Wednesday; he died about eight o'clock in the morning; after he was dead, I saw defendant in the bar-room on the lounge; a quarter or half an hour after he was dead; Reimann was on the lounge with her; hand to hand and head to head; there was no other person there; she did nothing when I went in; Reimann did nothing; I told defendant I wanted money; then she gave the key to Reimann, the key to the drawer in the counter; Reimann gave me the money, and I went out to a grocery store; I left the two there when I went out; deceased was buried on Thursday afternoon; I saw the corpse carried out at the funeral; after the hearse had started I saw defendant; she came into the bar-room not long after the hearse left; we could still hear the music; it was a military funeral; Reimann was in the bar-room; Mrs. Streit also; she was a boarder; defendant was sitting at the window; Reimann was behind the counter; Mrs. Streit was sitting opposite defendant at a window; Reimann then said, "Do you want a glass of beer, Mrs. Hartung, and you, Mrs. Streit?" then he asked me; I said "yes, I'll take a small glass;" Reimann then said, "Mrs. Hartung, do you want a small glass or a big glass?" she said, "I want a small glass;" she was very merry and laughing; she was laughing *after* she had taken the beer; I can't say whether Reimann laughed; I took my glass, and went out with the child; the first two months I was there, I slept in the kitchen; after that, in the second story in the back room, a small back room; during Hartung's sickness, defendant sometimes slept in the room, sometimes up stairs in a little room, and sometimes in another room; in the beginning of his sickness, and also in the latter days of his sickness, she sometimes slept in his room; Reimann had a small front room up stairs in the third story; I slept up stairs, in a front room, with the children, at the time of his death, in the third story; the first night after his death, defendant slept there with the witness and children; there were four beds in the room; the night after the funeral I slept again in the small room in the second story; defendant said she could not sleep well in the other bed; she would sleep in

the bed where I had been sleeping in; in the evening at ten o'clock she made up my bed in the little room; the bedstead was too large—would not go in; defendant herself sawed off so much that it would go in; then I slept in the little room; there were still four beds in the upper room; two bedsteads without bedding, or three; Reimann's room was a little front room on the same floor; I went to defendant's room next morning after breakfast; defendant had left the room; she was down stairs; in front of the bedstead I found half a segar on the floor; the bed she had been occupying; the bed was very much tumbled; the little child had slept with her, and was very wild; the oldest child had been sleeping in the other bed; I had seen no segar there the night before; after the death of Hartung, Reimann would take his place behind the counter when he came home from his work.

Being *cross-examined*, she testified: I have been in this country one year and seven months, and have lived all the time in Albany; I have not seen Mrs. Hartung since she was in jail; I have been to the jail since Mrs Hartung was confined there; I went there to take Reimann his meals, for the people I was living with; have seen Reimann three or four times since he was in jail, and have had conversations with him; the woman I was sewing for, did washing for him; Reimann came into the kitchen to take his meals; I shall be 29 years of age next summer; I did not know Hartung, or Mrs. Hartung, or Reimann, before I went to live with them; I never heard Hartung complain of being unwell before he took his cold at Schindler's; Hartung was laid up abed when I noticed the smell in the sandwich; I noticed that smell on everything he ate, two or three weeks before he was taken sick; I mean before he was taken sick abed; I noticed all these smells before he was laid up; Hartung was still at work when I noticed Mrs. Hartung throw this stuff into his food; it was two or three days before his death that I found the jar; I had not seen the jar before then, but I often saw her before that throw it into his food; Hartung ate with the family until he was taken sick to his bed; before he was taken to his bed, he generally took his

meals with the family when he was home at the regular time; at supper he was generally home, and then partook with the family; mostly he was at work for Schindler, and then he did not come home to dinner; if Hartung was at home he partook of breakfast with family; when he worked at Schindler's he sometimes came home at one hour, and sometimes at another; sometimes Hartung came home at one hour, and sometimes at another, when at work for Schindler; I don't know whether he then got his dinner; I don't know when he did his eating; because I paid no attention to it; I don't know of his having dinner at home at any time when he didn't dine with the family; if he didn't come at the regular meal times, Mrs. Hartung cooked for him; I never cooked for him; he took his dinner, and then went off again; I never heard him make any complaint about his meals before he took to his bed; the same smell was in the kitchen before he was taken sick, when he took his meals at home; I coughed when he was eating alone; Mrs. Hartung was there then, and I was there, and it was then the smell was so bad; it was only one single time that Hartung was eating in kitchen, and I ate of the same soup; I paid no attention whether Hartung coughed when I coughed; it was a fortnight or three weeks before Hartung was taken sick to his bed, that the towels smelled so bad; I picked up the little pot after Hartung's death; I picked up the pot after I had seen Reimann and Mrs. Hartung setting hand to hand, and head to head; I went up to bed-room to find the child; I didn't say this morning, I didn't know whether I went after the child or not; on Sunday previous to Hartung's death, Mrs. Hartung called the substance she wanted me to get, arsenic; she did not tell me how much to get; this was said in the basement; nobody was present; it was in the fore-noon, after breakfast.

State all the conversation that took place on Sunday.

Mrs. Hartung asked me "whether I was going out in the afternoon;" I said "yes, if I can I will go out;" Mrs. Hartung said "yes, if you take the child you may go;" nothing else was said in the morning; in the afternoon, about three

o'clock, I asked her "whether I should bring that stuff home with me;" oh, I have forgotten a great deal; if I am not asked for it, I forget it; only wait a little, and let me think it over; Mrs. Hartung said, " you must bring something along for Mr. Streit; the name of it is arsenic, and he is to stuff one bird, and you must be careful not to get it on your fingers, or dress, as it is poison;" then I said, if it is poison, Springhart will not give it to me; Mrs. Hartung said, " Oh yes, only say it is for Mr. Streit, and he will give it to you; I have been to Mr. Saulter's, and he did not have it;" in the afternoon, about 3, I asked Mrs. Hartung "if I should bring it," and she said "no, I will go after it myself;" I then went out, and got home before 6 o'clock; I don't know, whether I believe that Reimann and Mrs. Hartung occupied the same bed; I had no opinion whether the segar was left there by Reimann or not; Reimann was never in my room.

*Re-examined*, she testified : I tasted of the soup Hartung ate, and had to *vomit terribly ;* I took two spoonsful; it tasted not good; this was a fortnight or three weeks before he was taken down and while still at work for Schindler; I showed that soup to Mrs. Streit; Hartung had eaten of that soup in the kitchen, and that was the only time I saw him eating in kitchen; I cooked for the boarders; I first saw the little pot three days before Hartung's death; I took it in my hand and smelt it; after his death, I found the pot on the floor behind a box in the hall; I saw Mrs. Hartung fetch this stuff always for eight days or two weeks before he was taken sick to his bed, and always afterwards whenever she could ; I followed her the day when I found the jar; I saw where she took it from; I stood behind the door and saw her take it; Mrs. Hartung did not know I was watching her; the jar was then little less than half full; when I picked it up after his death, there was but little in it.

*Re-cross-examined*, the witness testified : I said this morning the same smell and taste was used in my country to poison rats; I recognized that smell from the first; I knew then, that for two or three weeks Mrs. Hartung was putting in her hus-

band's food stuff that smelt the same as we used to poison rats, but supposed it to be medicine, until I saw where she took it from; but then I thought it was not right, but didn't know what it was; Mrs. Hartung kept her eyes on me; and one time asked if there was any water in the tube; I was looking at her, and she at me; after I found the jar, I did not speak to Mrs. Hartung; I gave the jar to Mr. Streit; when I found the jar and smelled it, I replaced it in same place; I found the jar first on a shelf, and after Hartung's death on the floor; there were two jars, both smelling like this, and the same stuff in it; one day I saw one jar lying in the privy like this; I only found one jar with this stuff in; I did not notice Mrs. Hartung cough when she cooked the victuals; I gave the jar to Mr. Streit when Mrs. Hartung had gone out, and Reimann was at work; I gave it to Streit the same day I found it, and about a week or a fortnight after Hartung's death; I never told Hartung of her putting this stuff into his food; I spoke to Mrs. Streit about it the last week before Hartung's death, and then requested Mrs. Streit to smell the tea and coffee, &c.; this, I think, was the week before Hartung's death; I have heard Hartung and his wife quarrel; I don't know when it was; I was just going into the room; I heard Hartung say, " You manage me to get me sick, or make me clear out;" she said, " You may say whatever you like; I will do what I have a mind to; you may go where you came from; go to the devil;" then I went up and didn't hear any more; they often had a few words together; and Mrs. Hartung generally went off, and locked herself in another room; after Hartung's death, I saw all the bottles, and a little jar, like the one here, in the privy; Mrs. Hartung said the bottles were useless, and she would throw them in the privy; she said this two or three days before Hartung's death.

*Re-cross-examined:* The bottles were medicine vials that had accumulated during Hartung's sickness.

*Louis Saulter,* sworn as a witness for the prosecution, testified: I am an apothecary; my shop is at the corner of Green and Division streets; I know defendant; I had been acquainted

with her as long as she lived in Division street; I had seen her at my place several times before the death of her husband, before and during his sickness; the first time I saw her she came with Mr. Hartung; he told me she was unwell; complained of having pains in the stomach; he told me I should put up a little medicine for her; I prescribed for her; it was the first few days after they came to Division street; I saw her on several occasions after that, when she got small articles; some six weeks before his death, she procured a small jar of phosphorous paste; she complained of there being so many rats about the premises in consequence of the stable being near by; I told her to spread the paste on bread; I labeled it poison, and she went away; I recollect of seeing her again during his sickness; she brought some prescriptions, which I put up for Mr. Hartung; the prescriptions were from Dr. Levi; I saw her twice on the Sunday before her husband's death; first between nine and eleven in the forenoon; she was alone; she had some medicine prepared for her husband; she said that " one of her boarders desired her to bring along the same article that Mr. Heeshon uses for preparing bird skins to stuff;" I asked her " whether she knew the name of the article she wanted;" she said "no, she was not sure of it;" I asked her "if it was alum;" she said "no, it is not alum;" I told her, " as there were various drugs used for this purpose, she would do better by asking again what it was;" she said " she thought it would be best, that she should go home again and ask him, else he may come himself and get it;" then she left; I saw her again in the evening of the same day; it was just at dark; I lighted the store while she was there; she bought some marsh mallow and liquorice roots; she asked for this when she came in; I put these up for her, and delivered them to her; then she said: " It is arsenic I ought to have brought along this morning; give me six cents' worth of it;" then she told me " one of her boarders had brought home a couple of birds, and that he wanted to stuff them;" I put up some arsenic for her, three-fourths of an ounce of white arsenic; when I had it weighed, it was too dark to label it; so I lighted the gas, and

went to my desk to label it; then she said, "You need not take so much trouble about it;" I told her I was obliged to do that by law; that she must tell her boarder to take good care of it, for it is a very strong poison; then she said, "I did not know that, it is for Mr. Streit; I think he knows it;" then she left the store, taking the arsenic with her; I kept prussic acid in February, March and April; it is a poison; it is never used for cleaning kettles; phosphorous paste is a poison in large doses; it is used for killing rats; I sell it under the name of rat-poison.

*Cross-examined*, he testified: I swore before the coroner's jury that I was not sure that I had sold defendant rat-poison; I only remember it now because I see her face in court

*Charles W. Schindler*, sworn as a witness for the prosecution, testified: I live on the Bethlehem road; I know Hartung and defendant; have known them five or six years; I knew Emil before he was married; I was a brewer in March and April, 1858; Hartung worked for me then; he was peddling beer, and besides had a saloon in Division street; I put him up in Division street; so far as I know, he had nothing except what he had accumulated out of his wages; I gave him 2s. for every barrel he carried out; he had been at work for me two years; he was quite a healthy man; he had a conversation with me six or eight weeks before his death, about himself; I saw defendant on the day on which she left the city; I think it was three or four weeks after the death of Hartung; it was at her bar-room; I told her I had something important to inform her of; she went up stairs with me; I told her, there is a rumor in the city that you have poisoned your husband; she began to cry and gesticulate, and asked me whether I also believed what people were saying; I answered her, I would believe it too, if she was not willing to go with me right off to the District Attorney, or the police office; that she was owing it to herself and her children to have her husband disinterred at the expense of the State, and then it would become evident whether he had been poisoned or not, and whether she was guilty or not guilty; she began to cry very much, and requested me to

wait until to-morrow morning at nine o'clock, on account of her being unwell, and then she would go along with me to the police or the District Attorney; I then left her house; next morning Mr. Hardus came and woke me up; I was at the place frequently between the death of Hartung and the time defendant left; I saw Reimann acting as bar-keeper, selling beer and waiting upon the guests; nothing more; Hartung had been ·sick the last four weeks before he took to his bed; I told him to go to bed; he was about thirty years old; I cannot say that he was living intemperate; never have seen him drunk.

*Thomas McBride*, sworn as a witness for the prosecution, testified: I was a police officer in April, 1858; I was in the house of defendant after the death of her husband; before I went in on the morning of the 17th of May, I was on my beat, and passing through that street, I saw a light in the house; it was three o'clock in the morning; the light was in the bar-room; I went to the window; saw a gas-light burning; at first thought it was fire; saw a candle lit on the counter; there was a looking-glass in the rear of the saloon, and in that looking glass I saw the shadow or reflection of two persons; I watched there some fifteen or twenty minutes; I saw one person get up off the lounge there, and came towards the window where I stood; that person I thought was defendant; she turned down the gas and went to the drawer, and I could hear money rattle; she closed the draw, took the candle in her hand, and walked back towards the centre of the room, and set the candle down on the table; immediately afterwards, I saw two persons on the lounge again; they were lying down side by side; I watched them sometime, probably ten minutes; it had then got to be about half-past three; it began to look dark inside on account of the day-light, and then I left; defendant was one of the persons on the lounge, and Reimann the other; the same morning I went in there; it was on Monday; I saw defendant; it was between six and seven o'clock; I did not have a conversation with her; I went in again on Wednesday following; saw her; she was alone; I asked her how she got along since her husband died; she said not very well; I asked her

The People *v.* Hartung.

how long he had been dead; she told me three or four weeks; I asked her how many children she had; she told me two; then I told her I thought she was doing pretty well, because she sat up late at nights; she told me she did not; I told her I knew better; she asked me how I knew it; I told her I had seen it; she asked me how; I told her through the window; she asked me what I had seen; I told her I had seen her and Reimann on the lounge; she said they were not doing anything there; I told her yes they were; she asked me what I had seen them doing; I told her I had seen Reimann have his hands around her neck on the lounge, and kissing each other; I told her then that I thought they were doing something worse than all that; she denied doing anything more than kissing; then I told her she ought to be ashamed of herself to carry on in that way, and her husband dead only three or four weeks; I said, why don't you marry him if you like him; she said she intended to do so; that she did like him; then a German came in by the name of Miller; I asked him to take a glass of lager beer; Miller went out soon and I followed him; in the conversation she told me not to tell of what I had seen; I had another conversation with her after that; I afterwards went to New York to search for her; other officers were with me.

*Frederick Wirtz*, sworn as a witness for the prosecution, testified: I live in Jersey City; keep a tavern; I saw defendant on the 21st and 22d of May, at my house in Jersey City; Reimann was with her; this is the man; a little girl was with them; they got there about four o'clock; Reimann came first, and asked if he could stay over night with his wife; I told him yes; he said he would fetch his wife from the depot; he came back with defendant and the child; he asked for a room; I shewed them a room; at six o'clock I called them to supper; they all came down; they took supper; after that they went right away up stairs again; in the morning when I came from the market, about half-past seven, they were taking their breakfast; Reimann afterwards came to the bar and paid my bill; he asked me if his wife could stay there until 12 o'clock;

I said yes; he said he had some business in New York, and to take his wife and child with him was too much trouble; he went away with a carpet bag about 10 o'clock; at 12 o'clock I went up to her room, and asked defendant if she would take dinner; she said no, and asked me if it was 12 o'clock; I said yes; then she said, I must go, my husband is waiting for me; I went down, and she came right away after me, and went away; that was the last I saw of her until I saw her here; Reimann told me he came from Troy.

*Michael Ahearn,* sworn as a witness for the prosecution, testified: I live in Troy; I keep a small hotel; on or about the 21st of May I saw Reimann at my house; a woman was with him; I cannot recognize the defendant; they came at a late hour; there was something said when the woman was present.

*William P. Brayton,* sworn as a witness for the prosecution, testified: I was sheriff of this county in 1858; I know defendant; first saw her at Mr. Wetterbee's, in New Jersey; it was in July last; in consequence of information I received from Mr. James B. Sanders, and two Germans, I went to New Jersey; they had a letter when they came; this is the letter; it was put in my possession; I took it with me; after I came back I delivered it to the District Attorney; when I went to New York, I went to 1099 Broadway; I there found that Wetterbee lived six or seven miles from New York, at a place called Guttenburgh; went to the house of Dr. Wetterbee; I inquired for the doctor; he was not at home; I saw Mrs. Wetterbee and Thomas Matchen; I was asked into the sitting-room; defendant was called in; she was called Elizabeth when she came in; I recognized her by means of a daguerreotype which I had, and which I got of one of the policemen of this city; I called her " Mary ;" Mrs. Wetterbee said her name was " Elizabeth ;" I then asked her if her name was not " Mary Hartung ;" she made no answer; I asked her again "if her name was not Mary Hartung ;" she said it was; I asked Mrs. Wetterbee what name she went by; I understood her to say " Elizabeth Shultes ;" I asked defendant to turn her collar back to see if she had a spot on her neck; she did so, and I

saw the spot; I then told her I had a warrant from the county of Albany; she said she would go with me; I told her if it was executed there, she would have to go to jail in New Jersey; she consented to go with me; there was not much said about a requisition; she went and prepared herself, and she came to the boat with me; I brought her to Albany; next morning I put her in jail; after that I had a conversation with her in regard to the letter; it was sometime afterwards, perhaps a month afterwards; there was something said on our way up about a letter; I think she asked me if I had got a letter; I don't recollect her exact words; I had not told I had the letter; I afterwards had a conversation with the prisoner at the jail upon the subject of the letter.

The counsel for the People then proposed to prove what was said by the prisoner in that conversation.

The counsel for the prisoner duly objected to any statement made by the prisoner at that time being given in evidence, on the ground that the same was not a voluntary statement. The court overruled the objection, and decided to receive the evidence; to which ruling and decision the counsel for the defendant duly excepted.

The counsel for the prisoner, by permission of the court, then proceeded to cross-examine the witness, preliminarily to such evidence being received, and he testified as follows:

I cannot state the time of this conversation, but it was within two or three months after the prisoner was committed to the jail; I think likely some other persons were with me; but I don't remember whether there was or not; I don't remember what I went up to her cell for; I don't remember who introduced the conversation; I do not distinctly remember the first thing that was said; there was some conversation between me and her, previous to the subject of the letter being mentioned; I recollect a part of it, not all of it; I may have said to her that this is a very serious matter, but I don't think I did; I will not swear that I did not say to her, " Mary, if you had known that this letter would have led to your detection, you would not have written it;" I don't recollect that I

did; I will not swear that I did not invite her attention to this letter by some question.

The counsel for the prisoner again objected to the evidence of what was said at that conversation, on the ground that the statements then made by her were not voluntary.

The court overruled the objection, and decided to receive the evidence; to which ruling and decision the counsel for the prisoner again excepted.

Witness being then examined in chief, testified as follows: The first that I recollect that was said, was, she asked " what I thought they would do with her;" I told her "I didn't know; it may be it wouldn't be very hard with her yet, I didn't know what the evidence was;" I think she then said, "if she had not written a letter, she would not have been there;" I asked her "how she came to direct a (or the) letter (I am not certain which expression I used), to Ferdinand Shultes;" she said " Reimann told her to direct it so ;" I don't remember anything else that was said.

The counsel for the prisoner then moved to strike out the statements made by her, upon the ground that the same were not voluntary. The court refused to grant the motion, and the prisoner, by her counsel, excepted.

Being *cross-examined*, he testified : I did not think there was any harm in this conversation; I expected I should be a witness; if convicted, I don't know whether I shall claim a part of the reward; I should like to get half of it; I was in prisoner's cell one day previous to this with Mr. Courtney; I don't recollect whether it was Sunday afternoon or not; I think Mr. Courtney was in hearing of that conversation; I talked with her about the letter then.

*Louisa Streit*, sworn as a witness for the prosecution, testified: I live in Troy ; in March, April and May, 1858, I lived at defendant's; was a boarder there; my husband boarded there; we occupied the third story, a back room; we went there about the middle of March; we left about five weeks after Hartung's death; defendant was not there; she had been gone about a week and a half ; Reimann had gone, too ; I don't know when

he left; I recollect Hartung's sickness; saw him two or three times during his sickness; first saw him about a week before his death, in his room; nobody there; next saw him about a couple of days afterwards; defendant came in while I was there; defendant told me that Mr. Hartung wanted some apples; she jawed about it; said he troubled her to death; wanted so much from her; I got up and went up stairs, and peeled some apples, and brought them down stairs, and gave them to him; defendant was not there; he ate three apples; defendant came in while I stood at his bedside; she also had brought some apples; I then left; I next saw him the morning when he was dying; I believe it was six o'clock; defendant was present; Reimann also; Malder came after me; Hartung did not know anything when I went in; I heard Reimann say, "if it was anybody that belonged to him, he wanted to have a post-mortem examination;" I told him "I would, too;" defendant then said, "Oh no, we all know of what he died, and I don't think it is necessary;" this is all I recollect; I was in the bar-room the same morning about two hours after; Mr. Streit said he would have a post-mortem examination; defendant got up and said "no;" then I went up stairs; I saw Reimann and defendant together after Hartung's death, about an hour after; I found them in the bar-room sitting on a sofa; they were alone; they were setting near together, hand and hand, and head to head; I also saw them the day he was buried; saw them a couple of times; they sat in the bar-room again in the same way; it was about two minutes after the corpse had been removed; the second time they were talking together; it was about a couple of hours after the funeral was gone; defendant slept the night after the funeral in the room next to me; it was a large square room; three or four beds in it; next morning I heard Reimann; I sat in my room about two o'clock; we had been out; came home about two o'clock; Reimann came about fifteen minutes after; I heard him coming up stairs and going into his room; after a little while I heard his door open; heard him lock the door, and it seems to me as if he went into the next door, defendant's room; I then went to

bed; about six o'clock next morning I went down into the kitchen; in consequence of something that Mary said to me, I went back to my room; after a little while I heard her baby cry; I went to her room; rapped at the door, and called her; rapped twice; she said "yes, I am in;" she did not open the door; after a little while she came out with the baby on her arm, and went down stairs; I then went down in Malder's room; I went up stairs again; when I came on the middle of the stairs, I don't know what made me, but I turned round and looked at her door, and found I could see under the bottom of her door into her room; I saw two feet moving from her bed across the room, and going back again, dragging something along on the floor; then I stepped back, waiting to see who would come out; I saw Reimann coming out, and going in his room; during the time Hartung was sick, I was in the kitchen; Mary Foell handed me a bowl of soup; I did not taste of it; I smelt of it; it smelt like phosphorus; the effect was like that of inhaling gas; I had smelt the same in the kitchen; I can't say whether before or after; I saw a jar on a shelf, among bottles, in the hall; there was white stuff in it, like lard; it smelt like phosphorus; I left it there; it was not quite half full; Hartung was sick abed when I saw it; I have seen defendant taking coffee and tea to Hartung from the kitchen; I can't say what it was; have seen this once or twice; I have seen her stirring it with a teaspoon when she went up stairs; I went up stairs right after her; once I saw her in the hall where the stuff was, before she went up stairs; my husband is a bookbinder; sometime after the death of Hartung, there was a conversation in the dining room; defendant was there; it was at dinner; I asked Mr. Streit if he knew how to stuff birds; he said no; I asked him if he wanted Mrs. Hartung to get some arsenic for him; he said no; he asked Mrs. Hartung if he had asked her for arsenic; she said that Mary must have made a mistake; that she did not want arsenic, she wanted something to clean Mr. Hartung's mouth with; that she didn't say anything about arsenic; then we all got up from the table; when I spoke about stuffing birds, defendant

The People *v.* Hartung.

blushed; she was red like fire; we couldn't finish our meal at the table; nobody did; I went up into my room; remained about an hour; then I went down stairs; when I went down, defendant opened the back bar-room door, and called me in; she asked me what I thought about her; I told her, nothing; then she said, "For God's sake, don't say anything about it, folks might think something wrong about it;" then I left the room; I saw Schindler there the afternoon before defendant left; he was there about 2 or 3 o'clock; she went up stairs with him; they were gone a good while; I saw her after she came down; she seemed to me as if broken-hearted; she said nothing; she seemed as if she couldn't speak; Mrs. Harters was there, and asked her what the matter was; she said, nothing; she whispered with Mrs. Harters for most an hour and a half; they stood at the back window in the bar-room; I left them talking there; that is the last I saw of her; a few days before Hartung died, I had a conversation with defendant about Dr. Levi; about a week before; it was in the bar-room; I don't know; I believe it was in my room; I was sick, and was going to take a doctor; she advised me to take Dr. Levi, for he was a very good doctor; that she always had had him; that he always made Hartung well again; she said that this time he was so low that he couldn't make him well any more; I have seen defendant write; I *think* I would know her handwriting; I *think* the letter shown me is her handwriting, but I don't be sure.

Being *cross-examined*, she testified (being shown six papers in writing, she says): I do not know in whose handwriting these papers are; I cannot say whether they are in Mrs. Hartung's handwriting or not; I have been in this country eleven years; I lived only three or four months in Albany; I came from Troy here; I was examined as a witness before coroner Dean, and then testified to all I knew; I intended to state before the coroner all I knew then; I cannot fix the day of the conversation with Mrs. Hartung about Dr. Levi's attending me; I cannot swear it was more than a day or two before Hartung's death; whether longer or shorter I cannot say; I think

the conversation at the dinner table was five or six or seven days after Hartung's death; Mrs. Hartung sat there at the head of the table; Reimann sat on her left hand; my husband sat at her right hand; my baby sat next to him, and I sat next; Reimann sat near enough to Mrs. Hartung to put his foot on Mrs. Hartung's, if he chose; Reimann had red spots on his face, and looked scared, too; he looked at Mrs Hartung; Reimann said he didn't know anything about it; I told him no one had accused him; I told Reimann I didn't ask him anything about it; he said he didn't know my husband could stuff birds; and I told him I didn't ask him; Reimann was the first person who suggested a post-mortem examination; Mary Foell handed me the bowl of soup about five or six days before Hartung died; my best recollection is, it was two or three days before his death; I know Hartung was confined to his bed at the time; Hartung very seldom ate with the boarders, except at night; he sometimes took his dinner with the boarders, but very seldom; Hartung was complaining when we went there; I don't know how many days before Hartung's death it was that I saw the little jar on the shelves; it might be three, or four, or five, or six days before Hartung's death; I did not see Mrs. Hartung when she passed the shelves; I went into the kitchen as Mrs. Hartung was coming out, and cut a piece of bread for my child, and spread it, and went right up stairs, and when I left the kitchen Mrs. Hartung was half way up stairs; I smelt the phosphorus as I passed the shelf; I had never discovered that smell before; my husband is in New York; I don't know where he is; I and my husband separated about four months ago; I don't want to tell the cause of our separation; I once saw Mrs. Hartung writing a letter, and at another time writing two receipts; these are the only times I ever saw her handwriting; while she was writing I sat at the other side of the table; I never read anything that Mrs. Hartung wrote; I did not read the letter I saw she was writing, nor did I examine the writing at all; I saw her write a receipt a couple of times; never examined either of them; I think the letter that was shown me is Mrs. Hartung's

handwriting, because I think it is the same writing as the letter I saw her write, and that is the only reason why I think the letter shown me is her handwriting; I have known Reimann 17 years; I knew him in the old country; I knew all three of his brothers; one of them is now dead; I have been to the jail to see Reimann three times; on the night Reimann left, he came up stairs into my room about 7 o'clock, and put his arms around my neck, and kissed me good-bye; it was not until after Mrs. Hartung was arrested that I went to see Reimann in the jail; I knew Reimann and his parents in the old country intimately.

*Ferdinand Shultz*, sworn as a witness for the prosecution, testified: I reside in South Pearl street of this city; (looks at the letter before referred to) I saw this letter in July last; received it from the letter carrier; I gave it to the sheriff.

Being *cross-examined*, he testified: I don't know the handwriting of the letter; I read the letter twice, at home, and then before the sheriff; I went to New Jersey at the time the arrest was made.

The counsel for the People here offered the letter shown to the witness, Mrs. Streit, in evidence. The prisoner, by her counsel, duly objected to such letter being received in evidence, on the ground that the same was not sufficiently proven. The court overruled the objection, and decided to receive the letter in evidence; to which ruling and decision the prisoner, by her counsel, duly excepted.

The letter so received in evidence was written in the German language.

Three different translations of the letter were put in evidence—one made by Mr. *Schroeder*, in behalf of the prosecution, one by Mr. *Werner*, in behalf of the prisoner, and a third by the prisoner herself.

The following is the letter as translated by Mr. Werner:

"*July 5th*, 1858.

"MY DEAR GOOD WILLIAM.

"With grief I take the pen to write to you; I must know how it goes with you; I have no rest any more; I believe I

shall go crazy; I grieve myself half to death; dear, good William, now I will write you how it went with me, that Monday I left you; I went to Union Hill, from there to Guttenburgh; I asked a woman if she did not know where I could get work as a seamstress; she sent me to Dr. Wetterbee, and there I am now; I have got a very good place, very nice folks; they have no children; they always call me their own daughter, and I earn a good sum of money, and it is a very happy place; every day music—a piano and flute; but all that does not give me any pleasure; when I think of you, my dear, true William, my parents and my children, then my heart bleeds; I set alone many hours, and weep the bitterest tears; but all that does not help me; I see neither you nor my family; but I often think you are with me; I dream of you every night; dear William, I do not know whether you love me still, or whether you have forgotten me; my heart clings to yours; you don't know how I love you, or else I should not have committed this misfortune; dear, true William, do not feel bad; this unhappy misfortune which has occurred between me and you, I have only to attribute to you; your true love was the cause of it; you know dearly we loved one another. Oh, William, how terrible it is for me! no soul to whom I can open my heart; no person I know; what shall I do? if I could only know how you are, whether you are in prison or not, then I should feel content.

"On Sunday, the 4th of July, I prepared myself and went to Fort Lee; I thought to see your brother, and perhaps he could tell me something about you; but I did not see or hear anything of him. I went sorrowful to my home; dear William, I believe if your brother had seen me he would not have recognized me; I wear a nice, big flat, curl my hair, and low-neck dresses, and a small velvet ribbon round my neck, so that the mole on my neck is not seen. Dear, true William, from my heart I beg you to write as soon as possible; and as soon as you get my letter, go to my parents, and let them read the letter, but be careful that you are not seen; don't leave the letter behind you, and be careful, dear William; but write me,

too, if you paid Nic. Engle that $9.00; if not, let me know, and I will send you that amount of money, that you can pay him; but write to me who has got my things, and who has got the house; the $10.25 that you gave me, dear William, I have still, and have so much more as makes up $20, and I think that in a few months I shall have a nice sum of money; but, William, I wish you could come to New York, that I could tell you my feelings; you can come several times in the week, with the seven and a half o'clock boat; you can be careful so that nobody sees you; but before this, write me first how it goes with you, and then I will write you more how you have to act.

"Dear William, write me how the celebration of the new flag went off, whether you was happy or not; with all my heart I should be very glad if you had much pleasure.

"They undoubtedly make great ado about me in Albany; one thing more. I dreamed last week that my little Emma had died, for which I should feel greatly grieved; how often Rosy must be asking for her mother; how awful when I think about it; also write me how you arrived in Albany, and whether you had trouble with the child.

"Dear William, go to my parents if you want to write, so that nobody sees you; William, I tell you do not neglect it, but write as soon as you get my letter; I swear to you, and I will remain true to you to my end. I share my life with you; my respects and kisses to you many thousand times.

"Your much beloved,

"MARY THERESA KOEHLER."

"DEAR PARENTS:

"You will grieve yourself terribly on my account, on account of the occurrence of the terrible misfortune; you know well what was the cause—love. William loved me, and I loved him; I have never in my life loved a man as much as I loved William; I did not show him my love; I kept it still by me. Dear mother, you know how unhappily I lived with Emil; how many bitter tears I shed, and complained to you

of my distress; you know I did not love Emil; but I tried to make myself love him; I cannot write any more.

"I will write you a letter under your name, Louisa Leopold; but you must look in the Dutch paper every Saturday, and tell your number and name at the post-office, or else you cannot get the letter.

"Address Elizabeth Schuldzes, 1099 Broadway, New York."

*Noah S. Dean,* sworn as a witness on the part of the prosecution, testified as follows: I am a coroner; on the 21st of May, my attention was called to the case of Hartung; I summoned a jury; took them to the Universalist burying ground; we disinterred the body; Dr. Rheinhart was there; found the body in a remarkably good state of preservation; the feet and hands looked like those of a person who had not been dead more than two or three days; a post-mortem examination was made by Dr. Rheinhart; I assisted him; the trachea, stomach, liver, lungs and intestines were taken from the body; they were put into a pail, and delivered at the Medical College, to Murray, the janitor.

Being *cross-examined,* the witness testified: I am a practising physician and surgeon; I saw Rheinhart take out the contents of the body; the grave-digger supplied the pail, into which these portions of the body were put.

*George Murray,* a witness sworn on the part of the prosecution, testified as follows: I was janitor of the Medical College in May last; I received a pail from Dr. Dean in May last; the 21st of May, the latter part of the afternoon; I put it into the laboratory; it was covered with a paper; I could not find Professor Porter; I delivered the pail to Professor Porter the next day, about one o'clock.

*Jacob Rheinhart,* sworn as a witness for the prosecution, testified: I am a practising physician and surgeon; I knew Hartung; saw his body at the Universalist burying ground on the 21st of May; I made a post-mortem examination.

Being *cross-examined,* he testified: I stated before the coroner's jury, that the irritating matter, of which the deceased

died, must have been taken into the stomach two months before death; that is my opinion now.

Being *re-examined,* on the part of the prosecution, he testified: I am familiar with the appearances produced by arsenic: after death · there will be a corrosion of the mucus membrane of the stomach, from the pylorus to the œsophagus; sometimes pure arsenic will be found in the stomach; the white powder; the cause of Hartung's death was inflammation of the œsophagus and stomach.

By the court. I stated before the coroner's jury that the irritating matter must have been administered a long while, I suppose two months, to have produced the chronic inflammation of the throat; it might be that the death was accelerated by something else; the appearances which I observed could not be produced by arsenic administered within three days of the time of the death; the appearances were sufficient of themselves to produce death.

Being *re-cross-examined,* he further testified: A severe cold and drinking would be likely to produce such inflammation.

*Charles H. Porter,* a witness sworn on the part of the prosecution, testified: I am professor of chemistry in the Albany Medical College; I have had experience in post-mortem examinations, with a view to the detection of poison; I received from Murray a pail containing the contents of a body; it was on Saturday afternoon, the 20th or 21st of May; there was a paper over the contents of the pail; I think I can determine in many cases, where arsenic is discovered, whether it was placed there before or after death; in some cases from the appearance of the stomach or other organ examined; if, for example, on examining the stomach or the liver, I were to find it whole, and were to remove the exterior portions and find in the interior mass evidences of poison, I should believe that it was placed there, or came there during life; again, if on examining the stomach, I should find the interior surface, in and beneath the mucous membrane, with yellow patches, and should ascertain that they were composed of sulphuret of arsenic, I should believe that arsenic was administered while the person

was living; in this case I examined the remains, with a view to ascertain whether there was arsenic, and whether it was deposited there, before or after death; I discovered arsenic, and believe it came within those organs before death; I had no difficulty of satisfying my mind, that the arsenic I found was taken into the stomach before death; I detected arsenic in the stomach, and in the liver; the greater portion in the stomach; I found in two-thirds of the stomach, six grains of arsenic; the other third was reserved to be examined, in case the two-thirds should be destroyed; I have examined a part of the other third; found arsenic in that; from the discovery of the arsenic found, I should infer that most probably a large quantity had been taken; I should think the remaining portion was removed by purging and vomiting, and absorption into other organs; from finding a considerable quantity of arsenic present, I assumed that the person died from the effects of the arsenic taken; that is my present opinion; I could form an opinion as to the length of time that elapsed between the administration of the arsenic and the death; I did form such an opinion; I now have it; from finding a considerable quantity of arsenic, I formed the opinion that the person could not have lived long; it might have been one day or several days; I could not state, with any degree of certainty, to the presence of arsenic in the liver; I should suppose, that soon after the administration of any soluble poison, it might be detected or found in the different organs; arsenic is soluble; my profession leads me to become acquainted with the symptoms of poisoning by arsenic; first, faintness, nausea and vomiting, great thirst; this is nearly universal; one of the most characteristic symptoms; constriction of the throat; pain in the stomach, increased by pressure, generally a small pulse; irregular; rather frequent; sometimes twitching or convulsions of the limbs; diarrhœa and vomiting; I have seen hoarseness noticed; arsenic is considered by many to have a remarkable preservative action, preventing decay; that is the reason why it is used in preserving animals, skins, &c.; Taylor on Poisons, and Christison on Poisons; Otto is also a late and standard work;

3 or 4 grains of arsenic have been known to produce death; the quantity varies with the age, constitution and peculiar circumstances; my profession also leads me to a knowledge of the post-mortem appearances of death by poison; I should think it not unlikely that I would find more or less inflammation of the stomach; the mucous membrane would be more or less changed; there might be an appearance of blood being present; blackness arising from an engorgement of the vessels; these appearances I have myself seen in cases of arsenical poison; I should think it not unlikely that I should find inflammation in the smaller intestines; I should presume, though I could not speak with certainty, that the œsophagus would be inflamed.

The counsel for the People then proposed to the witness the following question: " In your opinion, *can a physician*, from a mere post-mortem examination of the exterior surface, and the indications of inflammation which he discovers, determine with any degree of certainty, the precise period of time when such inflammation was caused?" The prisoner, by her counsel, duly objected to such question, first, as immaterial and improper, second, as incompetent. The objections were overruled, and the prisoner, by her counsel, excepted.

The witness answered as follows: I think not; for this reason, that different substances might be used, which would produce more or less quickly, and to a greater or less extent, the inflammation. I discovered certain unnatural appearances which might have been caused by arsenic; in the stomach, I discovered appearances of inflammation; I speak of the interior surface; especially was this so near the lower orifice; I also noticed blackness in parts, beneath the mucous membrane, owing to the blood vessels being filled with changed blood; also that the mucous membrane was easily detached by pressure with the finger; I noticed the appearance of ulceration, or corrosion, in the upper part of the intestines; these are all the abnormal appearances that I observed, except patches of a gamboge yellow, upon the interior surface of the stomach; this same appearance was also noted upon the exterior surface of

the liver; these are the unusual appearances which arsenic might produce; all these are laid down as post-mortem appearances of death by poison; I regard the yellow spots as the most marked and striking indication; nothing but arsenical compounds will produce those spots. I found the sulphuret of arsenic; if a person had taken white arsenic while living, after death, as decomposition proceeded, the white arsenic might be converted into the yellow sulphuret of arsenic; sulphuretted hydrogen is evolved in the process of decomposition, and that unites with the arsenic; this combination produces sulphuret of arsenic. Witness presents a portion of the stomach, over which are spots of sulphuret of arsenic; witness also presents specimens of arsenic, and compounds of arsenic, which were produced by the examination. The card marked A, contains the results of the examination of two-thirds of the stomach; tube No. 1 contains sulphuret of arsenic; No. 2, metallic arsenic, black; No. 3, sulphuret of arsenic; No. 4, white crystalline arsenious acid, the common white arsenic of the shops; No. 5, black metallic arsenic; No. 6, porcelain, with metallic spots of arsenic; No. 7, the same. The card B contains the arsenic and compounds derived from the examination of the interior portions of the liver; No. 8, metallic arsenic, black; No. 9, porcelain, containing spots of metallic arsenic; No. 10, tube, containing metallic arsenic; No. 11, containing crystallized arsenious acid; it is not unusual to find arsenic in the liver in cases of arsenical poisoning; I employed a number of different processes—one, Marsh's method, another Reinsh's method, Fresenius and Balo's method; besides these, and the verification of the results obtained, other chemical tests were employed; each of these methods is distinct and independent of the other; I regard Fresenius and Balo's method as the best; it is absolutely impossible, in using these methods, to mistake another substance for arsenic. I have employed all these methods in this case.

Being *cross-examined,* he testified as follows: I am twenty-four years of age; I have been a professor of chemistry for about four years; two years of the time in the Vermont Medi-

The People *v.* Hartung.

cal College, and two years in the Albany Medical College; I was an assistant to Professor Silliman in Yale College, for about three years, before I took the professorship in the Medical College in Vermont; while in Vermont, I made tests for arsenic in the human stomach; I had but one case in Vermont; it was not a case of poisoning by arsenic; I examined three or four cases elsewhere, and in two of them found arsenic; I did not conduct the examination alone; since I have been in the Albany Medical College, I have examined about a dozen cases, and found arsenic in five of them; I conducted those examinations alone; the gastric juice may produce some effect on the stomach after death; the gastric juice might produce erosion of the stomach; gastric juice will not produce blackness of the stomach, to my knowledge; blackness might be produced by any powerful solvent; I decline answering, without I am compelled to, whether I swore that I examined to ascertain whether the arsenic was placed in the body before or after death; I did make such examination; I changed the method of examination to discover whether the arsenic was placed there before or after death; I did not suspect that arsenic had been placed in the stomach after death; I made the examination for the reason that I might take all the possible precaution; I did not make independent investigation to ascertain whether arsenic had been placed in the stomach before or after death; I made an extension of the same investigation; the extension applied to the determination of the quantity of arsenic present; the first part of the examination was devoted to an inspection of the stomach, to determine whether I thought the arsenic had been placed there before or after death; the latter part to ascertain the quantity; the other case was an extension of the first; the process of my examination was, first, a physical examination of the interior of the stomach; having satisfied myself of this, I continued the examination; it was from the physical examination of the stomach that I determined that the poison had been in the stomach before death; I made no chemical tests to determine that question; I

pretend to be able to judge from my own knowledge of the effects of arsenic on the stomach; I have never introduced arsenic into the stomach after death; beside myself, the janitor and a student have access to my laboratory; I have no idea where this student is; he is twenty-two or twenty-three years old; he had a key to my laboratory, and had the privilege of going in there when he pleased; I presume he might have been in the laboratory when I was making my investigations; I have some little reasonable doubt whether or not he was present; I don't remember whether he was present or not; I formed my opinion at time of examination as to the time which had elapsed between administering the poison, and time of death; I formed a definite opinion, which is not changed; that opinion is, it might have been one or several days; I produced six grains of arsenic from the stomach; I may have some little doubt whether that arsenic was administered within two or three days before death; I thought it might have been administered within a day; because, according to authors of repute, the administration of considerable quantities of arsenic might produce death within a day, or after the lapse of several days; one dose, in considerable quantity, might produce death as well as several doses; and one large dose, the day before death, might have caused death; I will not swear that this man did not die of disease of the brain.

It was then admitted by the counsel for the prisoner, that the name of the defendant's mother, before marriage, was Louisa Leopold.

The evidence on the part of the prosecution here rested.

It was then admitted that the defendant's maiden name was Maria Theresa Koehler; it was also admitted by the prosecution, that according to the general opinion and judgment of those who have known the defendant well for years, that her general character was good; it was also admitted by the prosecution that the six papers in writing, which were shown to the witness, Mrs. Streit, were in the handwriting of defendant.

*Leo. Altmayer*, sworn as interpreter.

*Mary Foell,* recalled, testified: Defendant did not tell me at any time before the death of Hartung, that "if she found me again with Reimann she would discharge me."

*Abraham Saulter,* sworn as a witness on the part of defendant, testified: I reside in Lydius street; I have seen defendant three times previous to this trial; I was at her place twice before her husband's death; I was there once when defendant was scolding Mary Foell; it was about two weeks before his death; I heard defendant speak to the girl; she told Mary "if she caught her and Reimann together again she would discharge her;" Mary said "it was Reimann's' fault, not hers."

Being *cross-examined,* he testified: first told this at Mr. Colvin's office this morning; went there of my own accord.

The evidence here closed.

After argument by counsel for the defendant, and by the Attorney-General on the part of the People, Mr. Justice *Harris* charged the jury as follows:

Gentlemen: Emil Hartung died on the 21st day of April last, of a violent illness; for several weeks he had complained of hoarseness and soreness of the throat; on the 11th, which was Sunday, he consulted Dr. Levi, and received from him a prescription for his complaint; the next day Dr. Levi was called to again visit him; after being twice solicited he did so, and he found him laboring under a serious illness. He again prescribed for him; Hartung continued to complain of hoarseness and sore throat, and was afflicted with coughing. He continued to visit him once or twice a day, and prescribed for him various medicines, under the operation of which he thought he was improving, until the Tuesday, the second week of his illness; he saw him on Tuesday morning, and still deemed his symptoms favorable; he left him that morning, and until then had discovered no unusual symptoms in his case. But when he visited him on Tuesday evening, about ten o'clock, when he again saw him, he discovered an alarming change in his appearance. When he looked at him, he discovered in his countenance indications of the appearance of death. He at once exclaimed, "What has been done?" "What has he taken?"

and turning to his wife, said, "What have you given him?" He lingered on through the night in excruciating pain, burning thirst, quick, irritated pulse, throwing himself from side to side, complaining of an intense pain in the chest, and beg· ging of those around him to cut it open, that he might be relieved. He lingered through the night, and died next morning between seven and eight o'clock. It is alleged, on the part of the prosecution, that this was not a natural death; that it was a death caused by felony; that he came to his death by poison, and that poison was administered by other hands than his own.

Now, gentlemen, the first question you are to consider, is, whether the allegation is sustained. Your inquiry will naturally be first directed to this question: Did Emil Hartung die by poison?—was that the occasion of his death? In addition to the symptoms described by Dr. Levi before the death, we have the fact, that after the body of the deceased had been in the grave four weeks, it was disinterred, and an examination had of it. You have had described by Dr. Rheinhart the appearance and contents of the stomach. But the most important, and perhaps the only competent testimony presented to you on this point, was the testimony of Professor Porter. He instituted a most careful scientific investigation of the contents of the stomach and liver; an examination which the counsel, as well for the defence as for the prosecution, admit to have been of a very able, thorough and scientific character, as it undoubtedly was; and the result of that investigation of two-thirds of the entire stomach, was the discovery of six grains of arsenic. If we admit, as we must, that the other third of the stomach contained the same proportion, equally diffused, we have the fact before us that the entire stomach contained nine grains of arsenic. If to this is added the quantity found in the liver, and the quantity which was diffused through other parts of the system, there was poison enough *present* to have killed three or four persons; for it is said that three or four grains of arsenic is sufficient to cause death. At any rate, gentlemen, this you will have no difficulty in saying, that there was poison

enough found diffused through the stomach and system of the deceased to render it impossible that he should live; the fact is established, that by some means a sufficient quantity of poison had found its way into the system to produce death. It has been argued by the counsel for the defence, that it is still possible that some other disease might have produced these causes. It is for you, gentlemen, to say whether that is your opinion; whether the cause of his death was or was not poison, and whether it is your duty to speculate as to the cause of his death, when it is in conclusive evidence that there was found in his stomach a poison sufficient to cause inevitable death. Now, gentlemen, if you are satisfied on this point that Emil Hartung came to his death by poison, the next most serious and painful inquiry is, who, if any, was the guilty agent? by whose hand was this poison administered? who was guilty? how came this arsenic in the system? how did it get there? who gave it? how came it there? and you, as the final arbiters of the fate of this unhappy woman, it becomes you to give to the consideration of the evidence your best thought, your most careful reflection and attention, that your powers will enable you to do. It is an awful position for any man to occupy, to sit upon the life of a human being; but it is well the duty thrown upon you has fallen into such hands. During the progress of this trial, I have, again and again, reflected upon the wisdom of the founders of our government, who placed cases like this in the hands of men like you, men selected from the body of the people. You have seen how carefully you have been examined to see that you stand indifferent; what careful regard was paid to the rights of the prisoner, and how scrutinizingly you were selected from among others, that you, and not they, should sit in judgment. It is a wise and merciful provision; none could devise a wiser or better mode of administering criminal justice. It becomes you to address yourselves to the duty before you with your best faculties; God give you strength and wisdom to do so. Some evidence has been given, gentlemen, and it was competent to show a motive for the administration of poison, to prove that the

accused had been guilty of improper conduct during the life-time of her husband. The first thing bearing upon the case related to some inquiry about prussic acid. It appeared that some time before the illness of Hartung, some six weeks before, the servant of Mrs. Hartung was sent, for what she calls "blau-seure," and that Mrs. H. told her that she wanted it to clean some copper vessels. On inquiring for it at the druggist's, the young man of whom she inquired for it, told her that he hadn't it, but if he had it he wouldn't give it to her, it was so violent a poison, that if she even smelt it, it would kill her before she reached home. On returning home, and in relating the result of her visit, she said to Mrs. H. that she was ashamed when the young man said this to her. The only reply was, "well," and the girl went and put her vial on the mantel. This is the story. I may as well say here as elsewhere, gentlemen, in regard to the testimony of this girl, which was deemed im-portant, you saw her on the stand, where she exhibited a good degree of intelligence and candor. She occupies a humble condition in life; she is a German girl; and you were obliged to receive her testimony through an interpreter. Considerable scrutiny should be exercised in giving full credence to the testimony of a girl in her condition, so received. It is not too much to say that, in a case of life and death, a jury, acting upon such testimony, should require that it be supported by corroborating evidence, before founding a verdict upon it. I saw no inclination on the part of this girl to pervert the truth; yet she is not very intelligent, and her sympathies are not entirely in harmony with the defendant. It is quite possible, also, bear this in mind, that when sent on this errand, nothing had occurred to excite her suspicion; it is quite possible that she may have mistaken the name of the article she was sent for. Perhaps the strongest evidence that this was not so, is the fact that when she related the conversation to her mistress, she did not try to correct her. But too much importance should not be given to this testimony. It was an afterthought. It had occurred before Hartung had been taken sick, and her recollection may have been impaired. The next fact adduced,

is in relation to the article called phosphorus paste.   In relation to that, the witness, Saulter, testifies.   There is something singular about it; what the article is, we do not know; what it consists of, we are not confident; all we know about it is, that one of its ingredients is phosphorus.   To what extent that enters into it we do not know, or whether it is poisonous; we only know that Saulter swears that if administered in large doses it would produce death; but what have we in relation to the use of this article?   The amount of testimony is about this: Mary Foell and Mrs. Streit had their suspicions aroused about some improper use of this article; whether it was administered to the deceased; whether any considerable quantity of it had been placed in the food, is not established; the testimony in regard to it amounts to about this.   There was ground for suspecting that in reference to the use of this article there was something improper; whether it is in evidence that there was an improper use of this article, it is for you to decide.   These are the only two points where guilty practices are attempted to be proved, until we come to the purchase of the article supposed to have produced death.   This part of the testimony demands your most careful consideration.   You are aware that the indications of approaching death were discovered for the first time on Tuesday evening; on the Sunday before, a little more than two days before the death, we learn from the apothecary that the accused was at his shop; she came there to have some medicine, prescribed by Dr. Levi, put up for her husband; when it had been put up, she said she wanted also some of that article which Mr. Streit used for stuffing birds; he said several articles were used for that purpose; she replied that she did not know the name of it; was it alum? she replied no; when he told her she had better inquire and call again, she yielded to that suggestion, or said Mr. S. would call himself; that same morning, before dinner sometime, she was in the kitchen, and inquired of the servant girl if she was going out that afternoon; the girl said she would like to; Mrs. H. replied that she might, and that she wished her, when she came home, to bring something from the druggist's shop in South

Pearl street; she went on to say that it would be very necessary for her to be very careful with it; that it was strong poison; that she must take care and not get it on her fingers or dress; and very careful that the child she was to take with her should get none on it.   The girl says she replied to this request by referring to the fact (and you will regard this as significant), that on a former occasion she had been refused an article of poison when she called at Saulter's; she replied, tell the druggist that one of the boarders wants it to stuff birds with, and he will give it to you.   This is about the substance of that interview.   The next and fourth step is, that we find the accused, just at the twilight on that Sunday, at the druggist's, where she buys some liquorice and another inoffensive article, and then adds: " The article I should have bought this morning is arsenic," and she asked for sixpence worth.   The druggist put up three-fourths of an ounce; he lit his gas at the same time, to see to label it, as the law requires, " poison." He went to his desk to do so.   She said it was unnecessary; the man who wanted it knew what it was, and it was not necessary to go to the trouble he proposed.   He said it was a strong poison.   She replied that she did not know that it was; but that Mr. Streit wanted it to stuff birds with.   This is the substance of this interview · and we have thus far these four facts proven: first, her application, on Sunday morning, for arsenic at the druggist's; second, her return home without it; third, her application to the girl to procure it for her, and her excuse; and fourth, her procurement of it just at dark.

Now, gentlemen, this article was thus procured; we find the accused in possession of three-fourths of an ounce of arsenic, and we find her husband dead from poison within 56 hours afterwards, and the question here arises, and it is the great point in the case, whether, in view of all these facts, your minds turn unhesitatingly to the accused as the person who procured and administered arsenic to produce the death of her husband?  · The defence has presented a theory, which is of sufficient importance to receive from you a careful inquiry, to see whether or not some other may not have procured and

The People *v.* Hartung.

administered this poison. The theory of the defence is, that this woman had surrendered herself to the man whose name has been so often mentioned, William Reimann, a boarder in the house, and that she was but an instrument in his hand, in removing the husband of the woman he had seduced. It is for you to say how far the testimony sustains this theory. The defence allege that he induced the accused to procure this poison; that she procured it without knowing the object for which he intended to use it, but that he intended to use it to accomplish what he effected. If this is so, if you can satisfy yourselves that it is so, that she was the mere tool of this man, then I say you will be justified in saying that this woman is not guilty of this murder. It is for you to say how far this theory is sustained by the testimony.

Now, so far as I have observed, the only testimony connecting Reimann with this transaction, in any way, is the following: You will remember, gentlemen, that during the night, or early in the morning, when Hartung died, Dr. Levi was sent for. At first he declined to go, but went the second time he was called for. The doctor found him insensible and dying. As he, the doctor, left the room, he discovered Reimann standing behind the door, where he could observe what was passing in the room. The doctor asked Reimann if he was aware of the condition of Hartung. He said he was. He then said it would be proper that Mrs. H. should be prepared for her husband's approaching death. Reimann's answer was, that she was prepared; that he had told her not to harm or grieve herself too much; not to make herself sick; that if she did, the children would suffer. This interview showed that Reimann was quite aware of Hartung's condition, and that he had informed Mrs. H. of it. This may be regarded as a piece of evidence to show that Reimann had a guilty knowledge of what was going on. So far as I recollect, there is no other fact going to show that he had any knowledge of the procurement or administration of the poison. The next fact of importance was elicited from the witness, Malder. He says, that at about 7 that morning, whether before or after the death does not ap-

pear, he had a conversation with Reimann and accused, during which R. remarked, that if a relative of his should die under such circumstances, he would have a post-mortem examination, but that Mrs. Hartung said she would not have it. It is for you to say what weight should be given to this. There is a natural aversion in many minds to such examinations, and it is for you to say whether his remark in any way points to her guilt. In regard to Reimann's remark, it was argued that it was an exhibition of craft and guilt, rather than of innocence, to avert attention from himself, and to fasten suspicion upon the accused. You must weigh this evidence.

The judge then proceeded to allude to the evidence, showing a guilty connection between the accused and Reimann. This does not materially bear upon the case. There was, it is clear, a warm and strong attachment existing between them. She was in his possession, under his control, infatuated. No other being had so much control over her. An incident occurred at the dinner table, five or six days after the funeral, which cannot have been forgotten by you. Mrs. Streit, whose suspicions were excited even before the death, by some means or other, had become possessed of the history of the accused's procurement of the arsenic, and, with a boldness somewhat remarkable, while all were sitting at dinner, asked her husband if he knew how to stuff birds. This must have fallen with crushing weight upon the accused. No, he said. Then she continued, did you send for arsenic to stuff birds with? No, was his reply. The accused, at these questions, evinced great embarrassment, and all left the table. The theory of the defence, in regard to this incident, is, that then, for the first time, the truth flashed upon the mind of the accused, that she had been made the instrument of Reimann to produce the death of her husband. If this be so, it may account for her subsequent conduct. An hour or two after, Mrs. H. called Mrs. S. into her room, and requested her to say nothing more on the subject. The judge then referred to her husband's employer's interview with her, two or three days after this. He told her of the suspicions excited, and begged her to clear herself of

those suspicions. She asked him if he suspected her. He said if he did not he would, unless she went before the authorities and demanded an investigation.

She said she was unwilling to go with him then, but if he would call next morning, she would do so. But instead of doing so, that night herself and Reimann left the city, lodged together at Troy, then proceeded to New Jersey, where she found a retreat in a small town in that State.

It is always a ground of suspicion against a person, that he tries to escape. It is deemed evidence of guilt, but is not always conclusive. In this case, she was with her lover, and the man she loved. He did go with her, and she was absent from the city nearly two months. The next piece of evidence is the letter she wrote to Reimann under the assumed name he gave her. This letter is deemed evidence of her guilt, but it is not conclusive. That letter falls, providentially, into the hands of a man bearing a name similar to that it had superscribed upon it. He opens it, and, knowing some of the facts in the case, handed it over to the sheriff. The judge reviewed the language of the letter at some length, and cautioned the jury against receiving it as conclusive of guilt, particularly as they had to rely upon a translation, which might not give fully the meaning of the writer. He alluded also to the remark which the accused made to sheriff Brayton, that, but for the letter, she might have escaped. The only importance to be attached to that evidence, was, that it proved that she wrote the letter, not that its language was proof of her guilt.

Gentlemen, in conclusion let me say, however guilty the accused may have been in other respects, however censurable, however unfaithful to her husband, however she may have followed her paramour, these facts should not weigh in the slightest degree on your minds, as to her guilt of this charge of murder. They are only admissible to show the motive which might have existed for the commission of the deed. The theory of the prosecution is, that the accused was induced to this act by her love for Reimann, that she might possess and enjoy him, and ultimately make him her husband. So far as

it bears on this point, this testimony is competent, but no further.

And now, gentlemen, you see that the important points involved in this case are embraced in a brief period of time, from the 18th to the 21st of April. You will inquire, when you retire, is the testimony adduced conclusive, that the accused procured the arsenic that caused the death of Emil Hartung, and was that arsenic administered to him by her hand? The law gives to the accused the benefit of every reasonable, rational, well grounded doubt. It is an admirable feature of our law, that maxim, that an individual is always to be presumed innocent until guilt is established. Every jury is allowed to act upon this presumption; and if the guilt of the accused, in this case, is not established to your entire satisfaction, this presumption comes in, and allows you to say that she is not guilty. It is the right of the accused, that she shall have the benefit of every reasonable doubt. But if, after considering the whole case; if, after a deliberate review of the testimony; if, after considering the testimony in all its bearings; if, then, your minds are led irresistibly to the conviction that the poison which produced his death was administered by the hand of the prisoner, that she is guilty of her husband's death, then, however fearful, however dreadful the consequences may be, however painful to her, you have no alternative. The oath which you have taken, that a true verdict you will render, requires that you should pronounce her guilty. Gentlemen, I submit the case of this unhappy woman to your hands. Be merciful, but just. Let your verdict be such that, in after life, when you reflect upon this awful moment, your consciences will be at rest. Hold the balance of justice with an even hand.

Give the accused the benefit of every reasonable doubt; but if you can find no such doubt on which your merciful wish can hang, then you must render a verdict of guilty.

Gentlemen, the destiny of the accused is in your hands.

The jury retired to consider their verdict on Saturday, the 5th day of February, and on Monday, the 7th day of Febru-

The People *v.* Hartung.

ary, came into court and submitted the following communication:

"The jury are willing and ready to admit that the prisoner is not innocent, but is guilty to a certain extent, *but not as principal.* We are *divided* on this question. Now, sir, they wish to know, if they can render any other verdict than 'guilty' or 'not guilty' of the crime of which she stands charged?"

*Judge Harris:* I see, gentlemen, the point on which your minds are laboring, and I feel bound to say this to you, that I can conceive of no aspect of the testimony in this case, which would warrant you in finding any other verdict than "guilty" or "not guilty" of the crime with which the accused is charged. There are cases where the testimony may warrant a conviction for a crime of an inferior grade; but in a case of this character, a case of poison, the accused is guilty or not guilty of the crime. While I am pained to say so, I am constrained to say that, in this case, a verdict of manslaughter would not be sustained by the evidence.

*Foreman:* Some of the jury wish to know if the counsel for the prosecution and the prisoner would agree on a different verdict than guilty, whether it could be done.

*Judge Harris:* I suppose not; counsel cannot agree upon a verdict. The jury have the physical power to render a verdict of manslaughter, as was done in a recent case; but I feel constrained to say it would not be warranted by the evidence.

*Foreman:* We wish further to state to your honor, *that it is utterly impossible for us to agree upon a verdict, either of "guilty" or "not guilty;" we have tried and failed.*

*Judge · Harris:* I would suggest, under the circumstances, the jury having had their minds engaged with this last proposition, whether it would not be advisable to retire for a few minutes, and look over the ground once more, after what has occurred in court.

The jury then again retired, and after an absence of fifteen minutes, returned into court again, with a verdict of "guilty,"

and the prisoner was sentenced to be executed on Wednesday, the 27th day of April, 1859.

A motion for a new trial was subsequently made and argued before the Court of Oyer and Terminer, on the ground of various irregularities alleged to have been committed. On denying the motion, the following opinion was delivered by

HARRIS, J. This application is founded upon irregularities which are alleged to have occurred in the jury room while the jurors were engaged in their deliberations. But *one* of these irregularities is established by proof. It *does* appear that one of the jurors inquired of a constable who was in attendance, whether the jury could not bring in a verdict of manslaughter, stating, at the same time, that if they could do so, the whole jury would agree on such a verdict. The constable, in violation of his duty as well as his oath, undertook to give his opinion. He said he thought they could, but added, that they had better consult their foreman, who, *being a justice of the peace*, would probably know. The Revised Statutes were subsequently sent for by the jury, and their provisions in relation to the crimes of murder and manslaughter examined.

This proceeding on the part of the jury was a reprehensible irregularity, and is sufficient to vitiate the verdict, unless it appears, beyond all reasonable doubt, that no injury has resulted from it to the defendant. It is necessary, therefore, to consider this question.

After the jury had thus endeavored to ascertain for themselves whether they could find the defendant guilty of manslaughter, they came into court and stated that they all agreed that the defendant was guilty to *some extent*, but were divided in opinion as to *the degree* of her guilt. They then inquired of the court whether they could render any other verdict than that of guilty or not guilty of the crime charged. They were instructed that a verdict of manslaughter would not be sustained by the evidence, and that guilty or not guilty of the crime charged was the only verdict which they could appropriately render. Under these circumstances, it cannot be possible that the defendant was in any way prejudiced by the

The People *v.* Hartung.

attempt of the jury to ascertain, by consulting the Revised Statutes, whether they could not convict her of a minor offence. It is very certain, I think, that the verdict has not been affected in the least degree by the impropriety of the jury in seeking to inform themselves as to the law.

The other charges of misconduct, some of which, if established, would be quite sufficient to avoid the verdict, are entirely unproved. These charges rest upon the affidavit of the defendant's counsel who do not profess to have any knowledge on the subject themselves, but make their statements upon their information and belief. Nor do they give the sources of such information. From the character of the charges, however, it may be inferred that it was derived from some one or more of the jurors themselves. The constables who were in attendance upon the jury, have each, so far as they could, denied the truth of these charges.

No rule of law is better settled than that the evidence of jurors is not to be allowed for the purpose of impeaching, or in any way impairing the effect of their verdict. The doctrine has long been established in England. It has been maintained with singular steadiness and unanimity in the United States. With the exception of Tennessee, where, following an early precedent, its courts have somewhat modified the rule, there is not, I think, another State in which the rule has not been asserted and enforced. Even in Tennessee, where the affidavits of jurors have sometimes been received to prove facts which tended to vitiate their verdict, the courts have repeatedly declared that the practice was dangerous, and ought not to be extended a single step beyond what it had already attained.

But aside from all adjudications, the doctrine rests upon the clearest principles of public policy. It is infinitely better that the irregularities which, undoubtedly, sometimes occur in the jury room, should be tolerated, rather than to throw open the doors and allow every disappointed party to penetrate into its secrets. The most enlightened jurists have united in deprecating the mischiefs which would flow from such a license. Nothing would be more sure to detract from the confidence, or

weaken the security which the community now feel in this justly cherished mode of trial. If this sanctuary were to be thrown wide open and an inquisition held upon the conduct of jurors, and the reasons upon which, individually, their verdict was founded, the trial by jury, now held in such sacred regard, could not long survive the dishonor to which it would inevitably be exposed.

But if jurors should not be allowed to give evidence to destroy their own verdict, how much more objectionable it would be to allow them to expose the occurrences of the jury room, and to allow their unsworn and irresponsible statements to be brought second-hand before the court in support of an application to set aside their verdict. It is impossible to give the least effect to such statements without a fearful departure from the very first principles of evidence.

A point was made by the defendant's counsel, though it was not much pressed upon the argument, that the constables sworn to attend the jury were one or more of them constantly present in the jury room. The practice is not, in my judgment, to be commended, and yet it is almost, if not quite, universal, and I know of no rule which prohibits it. Few verdicts could stand if this were a ground of impeachment.

The only other ground urged by the defendant's counsel in support of their application, is, that the verdict is not, and could not have been, the result of that calm deliberation and concurring judgment which alone could fitly characterize so momentous an act. I have not thus regarded the action of the jury. From the commencement of the trial until their verdict was pronounced, I believe the jury were fully impressed with the solemnity of their duty. Certainly I have seen no evidence to the contrary.

It is true that after they had been engaged in their deliberations *forty-eight* hours, they declared themselves unable to agree upon a verdict, and yet, in a very few minutes after, they rendered their verdict of guilty. To me, however, in view of all the circumstances, this fact does not seem surprising. The defence was presented with a degree of zeal and professional

The People *v.* Hartung.

skill unsurpassed, if not unequaled, in my experience of criminal trials. To all who witnessed the trial, its effect was manifest. It was felt by all. It awakened not only in the jury, but in all who took part in the trial, an active sympathy for the defendant. The press of the city and the community generally, manifested a kindred feeling. It was under these circumstances and such influences, that the jury retired to deliberate upon their verdict.

The theory of the defence had been that but one person was guilty of the crime as principal, and that the defendant was not that person. It is evident, from the communications received from the jury during the progress of their deliberations, that much of their time was occupied with the consideration of the question whether the defendant or the other person, whose name was associated with that of the defendant in the testimony, was most guilty. No juror seems at any time to have thought the defendant innocent. The question upon which they were divided in opinion, was, which of the two persons implicated in the transaction was *most guilty.* Thus, in the communication made to the judge by one of the jurors on Sunday evening, it is asked whether, "if the jury, after the most careful and laborious investigation, are absolutely unable to find which of the inculpated parties is *most guilty,* a verdict of *not guilty* could be rendered." The communication made to the court on Monday morning, indicates a similar division of opinion among the jury. When, in consequence of the instructions they then received, the jury found themselves restricted to the single question whether the defendant was guilty or innocent of the crime charged, without reference to the guilt or innocence of any other person, their previous deliberations had prepared them to answer the question. Their work was done, and they at once and unanimously said, she is not innocent—she is guilty. The verdict was clearly warranted by the testimony. The defendant had herself procured the poison. She procured it, too, in a manner and under circumstances tending strongly to prove a guilty purpose. It was in her hands on Sunday evening. On Tuesday it was hastening

to perform its deadly work. It is *possible* that the poison passed from the hand of the defendant to *another hand*, by which it was administered to the deceased. But the testimony reveals no such hand. And even if it were conceded that another participated in the crime, the circumstances are such as scarcely to warrant the jury in exonerating the defendant from guilt.

Having thus considered all the grounds presented by the defendant's counsel, in support of their application, and, as I trust, with an anxious desire that no injustice should be done to the defendant, the conclusion to which I have been led is, that the court is not at liberty to interfere with the verdict. The motion for a new trial must therefore be denied.

New trial denied.